**FOR PUBLICATION IN WEST'S HAWAI‘I REPORTS AND PACIFIC REPORTER**

<span style="color:red">**Electronically Filed**
**Intermediate Court of Appeals**
**CAAP-20-0000175**
**27-APR-2022**
**08:39 AM**
**Dkt. 131 OP**</span>

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI‘I

---o0o---

NO. CAAP-20-0000175

STATE OF HAWAI‘I, Plaintiff-Appellee,
v.
BRANDON FETU LAFOGA, Defendant-Appellant,
and
RANIER INES, ALSO KNOWN AS SCHIZO, Defendant-Appellee

AND

NO. CAAP-20-0000589

STATE OF HAWAI‘I, Plaintiff-Appellee,
v.
RANIER INES, ALSO KNOWN AS SCHIZO, Defendant-Appellant,
and
BRANDON FETU LAFOGA, Defendant-Appellee

CAAP NOS. 20-0000175 and 20-0000589

APPEAL FROM THE CIRCUIT COURT OF THE FIRST CIRCUIT
(CASE NO. 1PC161001176)

APRIL 27, 2022

GINOZA, CHIEF JUDGE, LEONARD AND NAKASONE, JJ.

OPINION OF THE COURT BY NAKASONE, J.

This consolidated appeal[1] arises out of an underlying September 16, 2015 incident where the complainant Kele Stout (**Stout**) was pistol-whipped, forced to drive at gunpoint, had his phone and wallet taken, then repeatedly beaten, including with a baseball bat, and shot in the face, torso, and buttock. Stout managed to escape and drive himself to Waiʻanae Comprehensive Health Center, where he received treatment and survived.

Plaintiff-Appellee State of Hawaiʻi (**State**) charged Defendant-Appellant Brandon Fetu Lafoga (**Lafoga**) via a July 20, 2016 Indictment with Attempted Murder in the Second Degree (**Attempted Murder**) in Count 2; Criminal Conspiracy to Commit Murder in the Second Degree (**Conspiracy to Commit Murder**) in Count 3; Carrying or Use of Firearm in the Commission of a Separate Felony (**Use of Firearm in Separate Felony**) in Count 4; Kidnapping in Count 6; and Ownership or Possession Prohibited of any Firearm or Ammunition by a Person Convicted of Certain Crimes (**Felon in Possession**) in Count 8. The State charged Defendant-Appellant Ranier Ines (**Ines**)[2] with Accomplice to Attempted Murder in Count 1; Conspiracy to Commit Murder in Count 3; Kidnapping in Count 5; and Robbery in the First Degree in Count 7. Following a jury trial, Lafoga was convicted of Attempted Murder in Count 2, Use of Firearm in Separate Felony in Count 4, and Felon in Possession in Count 8. Ines was convicted of Accomplice to Attempted Murder in Count 1. Following an extended term sentencing jury trial, Lafoga was sentenced to consecutive and extended terms in all counts, including a term of life imprisonment without the possibility of parole (**life without parole**). Ines was also sentenced to an extended term of life without parole.

**Lafoga's Appeal**

In CAAP No. 20-0000175, Lafoga appeals from the February 20, 2020 Judgment of Conviction and Sentence, Notice of

---

[1] The defendants were indicted and tried together as co-defendants in Criminal No. 1PC161001176. We consolidated their appeals under CAAP-20-0000175.

[2] Ines's first name is incorrectly spelled in the Notice of Appeal, as "Rainier." The correct spelling is "Ranier."

Entry, filed by the Circuit Court of the First Circuit (**Circuit Court**).[3]  On appeal, Lafoga contends that:  (1) the Circuit Court erred when it ordered that the jury would be "partially anonymous," where jurors were referred to by number and not by name; (2) Lafoga's trial counsel was ineffective for failing to object to the Circuit Court's procedure referring to jurors by number and not by name; (3) the Circuit Court erred in refusing to instruct the jury on included offenses for Attempted Murder; (4) the Circuit Court erred in denying Lafoga's Motion to Dismiss for Violation of Hawai'i Rules of Penal Procedure (**HRPP**) Rule 48 (**Rule 48 Motion**); (5) the Circuit Court's extended sentencing jury instruction for Attempted Murder that "characterized a non-extended sentence" as a "possible life term of imprisonment" and an extended sentence as a "definite life term of imprisonment" was erroneous and prejudicial; and (6) the Circuit Court erred in determining that an extended sentence under Hawaii Revised Statutes (**HRS**) § 706-661(1) was applicable to the offense of *Attempted* Murder.

### Ines's Appeal

In CAAP No. 20-0000589, Ines appeals from the September 2, 2020 Amended Judgment of Conviction and Sentence, Notice of Entry, filed by the Circuit Court.  On appeal, Ines contends that:  (1) without prior notice, the Circuit Court, *sua sponte*, empaneled an anonymous jury which violated Ines's right to a fair trial; (2) the Circuit Court erred in refusing Ines's included offense instructions for Accomplice to Attempted Murder and Conspiracy to Commit Murder; (3) the language in the Circuit Court's extended sentencing jury instruction regarding the sentence being extended from "a possible life term of imprisonment" to a "definite life term of imprisonment" was prejudicially "deceptive and misleading;" and (4) the Circuit Court imposed an illegal sentence because HRS § 706-661 does not provide for an extended term of imprisonment for Attempted Murder.

---

[3]     The Honorable Paul B.K. Wong presided.

We hold that the Circuit Court's modified jury selection procedure of referring to the jurors by number and not by name, and of withholding the jurors' names and information from the defendants but not from their counsels, did not constitute plain error under the circumstances of this case. We also conclude that the extended sentencing statute, HRS § 706-661(1), does apply to Attempted Murder in the Second Degree. As to all other challenges raised by both defendants, we conclude there was no error. For the reasons explained <u>infra</u>, we affirm.

## I. BACKGROUND

The following evidence was adduced at the jury trial held from November 18, 2019 to December 3, 2019.

### Complainant Kele Stout

Stout testified that on September 16, 2015, he and Ines were co-workers at a custom countertop company, working on an installation job in downtown Honolulu. Initially, Ines "got mad" at Stout because Stout "wouldn't teach him how to seam." Later, when preparing to leave the job site in the work van, Ines accused Stout of going through his bag. As Stout drove them into the street, Ines grabbed Stout's right wrist from the steering wheel, pulled out a gun from his backpack, and pistol-whipped Stout in his eyebrow. As blood started gushing, Ines ordered Stout to drive out towards Waiʻanae. Throughout the drive toward Waiʻanae via Nimitz freeway, Ines said multiple times that if Stout tried to do anything, "I'll shoot you." Ines held on to Stout's right wrist during the entire drive, while aiming the gun at Stout's face. As Ines "made a bunch of phone calls," he controlled Stout by holding his wrist, with the gun in his lap. On one of the phone calls, Stout heard Ines say that "he has the rent money." Ines searched Stout's wallet which was on the dashboard, took Stout's debit card, and asked Stout for his "PIN number" to which Stout complied. Ines grabbed Stout's phone from the dashboard, and smashed it on the dashboard, breaking it. Stout later testified that he heard Ines tell someone "we're coming to your house, and be ready because this person needs a beating[.]" Ines told Stout, "I'm not going to kill you, we're just gonna beat you and let you go[.]"

As they reached the beginning of Maʻili, Ines ordered directions to Stout until they ended up off Farrington Highway, at a house in the Sea Country area. A Polynesian male, later identified as Lafoga, brought Stout from the van into the garage, closed the garage door, asked Stout what he did to make Ines so mad, and then tied Stout's wrists behind his back. Stout was seated in the middle of the garage when Ines and Lafoga began beating Stout -- Ines with his fists, and Lafoga with a baseball bat. Stout was struck in the back of his head, and blood gushed everywhere. Stout believed someone grabbed a towel and put it over his head, and they continued beating him. It appeared to Stout that they just went until they ran out of energy, because the hits became softer, and it "sounded like they were winded, breathing harder."

Ines and Lafoga then went through the door in the garage into the house, where Stout could barely hear their conversation. Stout testified that he heard Ines, Lafoga, and a third male voice discussing what to do next, and he heard Ines order somebody to take care of the body. Stout also testified that he heard Ines say, "I'm gonna go leave and pick up my girlfriend, take care of him[,]" and Stout could only assume what that meant. Stout acknowledged that it was possible that he told the police, "I still didn't think I was going to get shot or anything." When Ines came through the doorway to the garage and saw Stout wiggling, he yelled out that Stout was trying to escape, and Ines and Lafoga both ran in and beat Stout again. Stout was thrown into the back of the work van, and Ines slammed the van door shut. Lafoga got into the driver's seat and then drove off with Stout, but without Ines.

At some point, Lafoga stopped the van somewhere, got out and started talking to a person he met there, bragging about what he and Ines had done to Stout, and then telling the person to go look through the back window. Stout saw a figure come to the back window of the van, but he didn't get a good look at anyone.

Later, Lafoga started driving again, and told Stout that he "[will] be the first person that he is going to kill . .

. ." Stout told Lafoga to let him go, but Lafoga replied he couldn't do that. Lafoga later parked the work van in a quiet spot where no one was around, then climbed into the back of the van, and shot Stout in the face. Stout felt like his face was caving in; the blood felt like lava, and it was very painful. At some point, Stout realized he "wasn't dead yet," and he was inhaling and swallowing blood. Stout managed to break out of the restraints and rolled onto his stomach. Lafoga had started driving again, but when he realized Stout was still alive, he turned back and shot Stout again, this time in the torso and buttock. Stout believed Lafoga was going to keep shooting him the more he made noise, so he tried to muffle the sounds of his breathing and coughing. Stout heard Lafoga making phone calls, trying to find somebody to give him a ride; Stout also heard Lafoga explain to someone that he was trying to burn the van with Stout's body still in it. When Lafoga stopped the van and exited, Stout could hear the engine still running; Stout then jumped into the driver's seat, locked the doors, and drove off toward the Wai‘anae Coast Comprehensive Health Center (**Wai‘anae Comp**). Stout told the Wai‘anae Comp security guard he had been shot, and that someone tried to kill him.

### Wai‘anae Comp and Queen's Medical Center witnesses

Christopher Miranda (**Miranda**), a registered nurse at Wai‘anae Comp, testified that on September 16, 2015, at around 7:22 p.m., he received a radio call that a person had parked at the former emergency room (**ER**) and told security that he had been shot. Miranda and another nurse proceeded to the old ER, where he saw a white van with Stout in the driver's seat with his head and arms hanging outside the window. There was a thick blood clot dripping from Stout's head, and Stout had a wound to the back of his head and on the front part of his face, where most of the blood was coming from. When Miranda asked Stout what happened, Stout replied he had been shot, and someone tried to kill him. Stout was taken to the new ER. Because there were no blood products at Wai‘anae Comp, and Stout had so much blood on him, Miranda was concerned that Stout needed to be transferred to another facility as quickly as possible. At the time, Miranda

believed Stout had been shot six times. Miranda asked another nurse to cut the "shoestring" off Stout's wrists, which had caused "ligature marks." After intubation and sedation, Stout was transferred to the Queen's Medical Center ER at Punchbowl (**Queen's**), trauma unit.

Stout was admitted to Queen's the same day, and on the following day, September 17, 2015, was treated by Queen's trauma surgeon, Dr. Susan Steinemann (**Dr. Steinemann**). Dr. Steinemann treated Stout for injuries related to "at least four" gunshot wounds to his scalp, jaw, torso, pelvis/rectum area, right femur/hip bone, and left thigh. The injuries from at least two of these gunshot wounds would have been fatal if Stout had not been treated -- the wound that damaged Stout's pelvis/rectum area, and the wound to his jaw with the bullet still lodged in "the left side of his head."

### Randi DeCosta

Randi DeCosta (**DeCosta**) testified that she was Lafoga's girlfriend in 2015. DeCosta identified State's Exhibit 303 as a photograph depicting Lafoga. DeCosta testified that she knew Anthony Riley, an African-American male, whose nickname was "Tonez" (**Tonez**). DeCosta testified that on September 16, 2015 around 3:00 p.m., DeCosta received a phone call where Lafoga told her that he "had to handle stuff" and that "he had to go." The next phone call from Lafoga was a "couple of hours" later, when the sun "was setting." In this second phone call, Lafoga told her that he beat up a man at his mom's garage with a baseball bat, and there was "big blood" all over the garage. When Lafoga was leaving the house in the van, a guy was in the back part of the van. Tonez then showed up at the house, and Lafoga and Tonez took the man "up the valley." Id. at 21. Lafoga said that he shot the man, the man was begging and choking on his blood, Lafoga told the man to shut up, and Lafoga turned around and shot the man. Lafoga told DeCosta not to worry because he put a towel over the man's head. Lafoga said the man was dead, and Lafoga was going to burn the van, and then Lafoga hung up. Lafoga called DeCosta back a very short time later, sounding "worried and scared," and said the van was gone. It sounded like Lafoga

was talking to Tonez, and that Lafoga told Tonez that Tonez was supposed to stay by the van, and to watch it. Lafoga said that all Tonez had to do was watch the van. Lafoga told DeCosta he thought the van got towed. Lafoga said that he had gone into the store to get stuff to burn the van, and that the gun was in the van. Lafoga hung up. Later that night Lafoga called again to tell her he told his mom what happened and that his mom was going to fly him out as soon as possible. DeCosta recalled that Lafoga subsequently left Oahu and flew to Alaska, which she thought was the "same day." Around October 2015, DeCosta testified that she remembered seeing a Crime Stoppers news release with a composite sketch of a suspect and the shooter. DeCosta wasn't sure if it was Lafoga, "because there was no tattoos on the drawing." The State published Exhibit 383 and DeCosta was asked if the exhibit was the composite sketch she saw at the time, to which she answered yes. The State asked DeCosta if she had spoken to Lafoga about the composite sketch when he was in Alaska, and she confirmed that she did, and that Lafoga said the composite sketch, "looked like him. He knew that was him." When DeCosta spoke to Lafoga about the shooting via phone, she described Lafoga's demeanor as "like happy, like proud," and Lafoga was "confident that he got away[.]" DeCosta testified that Lafoga said the man he shot was begging, coughing and choking on his blood, and Lafoga kept telling the man to "shut the fuck up." Lafoga told DeCosta that he told the man that he had never killed anybody before, and that the man would be the first person that he killed. Lafoga told DeCosta that Tonez also shot the man. DeCosta identified a T-shirt depicted in Exhibit 277 (a photograph of the contents of the white van), as belonging to Lafoga.

**Ricol Arakaki**

Ricol Arakaki (**Arakaki**) testified that her grandfather and Lafoga's grandmother were brother and sister, however Arakaki denied they were blood "related," but there was a "family relationship" as Lafoga was adopted. Lafoga told Arakaki that he had pulled a man out of a vehicle, beat him up, and shot him in the vehicle. Arakaki testified that Lafoga never mentioned

anybody else firing the gun at Stout, or that anyone else was in the vehicle with them.

**Verdict and Sentencing**

The jury returned a verdict on December 4, 2019, finding Lafoga guilty as charged of Attempted Murder (Count 2), Use of Firearm in Separate Felony (Count 4), Kidnapping (Count 6), and Felon in Possession (Count 8); and Ines was found guilty as charged of Accomplice to Attempted Murder (Count 1)[4] Kidnapping (Count 5); and Robbery (Count 7).

Following a further trial on extended term sentencing on December 6, 2019, the jury determined that, in Counts 2, 4, 6, and 8, Lafoga was a persistent offender and a multiple offender, and that extended terms of imprisonment were necessary for the protection of the public; and in Counts 1, 5, and 7, Ines was a persistent offender and a multiple offender, and that extended terms of imprisonment were necessary for the protection of the public.

On February 20, 2020, the Circuit Court sentenced Lafoga in Count 2 (Attempted Murder) to an extended term of life without parole, with a 20-year mandatory minimum term; in Count 4 (Use of Firearm in Separate Felony) to an extended term of life imprisonment with the possibility of parole (**life with parole**); and in Count 8 (Felon in Possession) to an extended term of 20 years imprisonment.[5] The Circuit Court ordered Lafoga's sentences in Counts 2, 4, and 8, to run consecutively.

On July 30, 2020, the Circuit Court sentenced Ines in Count 1 (Accomplice to Attempted Murder) to an extended term of life without parole.[6]

Both defendants timely appealed.

---

[4]     Count 3 (Conspiracy to Commit Murder) against Ines was given to the jury as an included offense of Accomplice to Attempted Murder.

[5]     The Court applied merger to Kidnapping in Count 6.

[6]     The Court applied merger to Kidnapping in Count 5 and Robbery in the First Degree in Count 7.

## II.  STANDARDS OF REVIEW

### A.  HRPP Rule 48 Dismissal

The appellate court reviews a trial court's denial of a HRPP Rule 48 motion to dismiss under both the "clearly erroneous" and "right/wrong" tests:

> A trial court's findings of fact (FOFs) in deciding an HRPP 48(b) motion to dismiss are subject to the clearly erroneous standard of review.  An FOF is clearly erroneous when, despite evidence to support the finding, the appellate court is left with the definite and firm conviction that a mistake has been committed.  However, whether those facts fall within HRPP 48(b)'s exclusionary provisions is a question of law, the determination of which is freely reviewable pursuant to the "right/wrong" test.

State v. Choy Foo, 142 Hawaiʻi 65, 72, 414 P.3d 117, 124 (2018) (citations omitted).

### B.  Plain Error

HRPP Rule 52(b) provides:  "Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court."  An appellate court "will consider issues that have not been preserved below" when "necessary to serve the ends of justice[.]"  State v. Barnes, 145 Hawaiʻi 213, 218, 450 P.3d 743, 748 (2019) (citing HRPP Rule 52(b)).  "It is firmly established that the relevant inquiry when evaluating whether a trial court's plain error may be noticed is whether the error affected substantial rights.  Thus, a reviewing court has discretion to correct plain error when the error is not harmless beyond a reasonable doubt."  Id. (citations and internal quotation marks omitted).

### C.  Jury Instructions

"When jury instructions or the omission thereof are at issue on appeal, the standard of review is whether, when read and considered as a whole, the instructions given are prejudicially insufficient, erroneous, inconsistent, or misleading."  Stanley v. State, 148 Hawaiʻi 489, 500, 479 P.3d 107, 118 (2021) (citations omitted).  Erroneous jury instructions are subject to plain error review "because it is the duty of the trial court to properly instruct the jury."  State v. DeLeon, 131 Hawaiʻi 463, 479, 319 P.3d 382, 398 (2014) (quoting State v. Nichols, 111

Hawaiʻi 327, 337, 141 P.3d 974, 984 (2006)).  "As a result, once instructional error is demonstrated, we will vacate, without regard to whether timely objection was made, if there is a reasonable possibility that the error contributed to the defendant's conviction . . . ."  Id.

D.    **Statutory Interpretation**

The interpretation of a statute is a question of law reviewable *de novo*.  State v. Thompson, 150 Hawaiʻi 262, 266, 500 P.3d 447, 451 (2021).

> First, the fundamental starting point for statutory interpretation is the language of the statute itself. Second, where the statutory language is plain and unambiguous, our sole duty is to give effect to its plain and obvious meaning.  Third, implicit in the task of statutory construction is our foremost obligation to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself.  Fourth, when there is doubt, doubleness of meaning, or indistinctiveness or uncertainty of an expression used in a statute, an ambiguity exists.

JD v. PD, 149 Hawaiʻi 92, 96, 482 P.3d 555, 559 (App. 2021) (citation omitted).

E.    **Included Offense**

"Whether an offense is an included offense of another is a question of law" reviewed *de novo* under the right/wrong standard of review.  State v. Manuel, 148 Hawaiʻi 434, 439, 477 P.3d 874, 879 (2020) (citation omitted).

## III.  DISCUSSION[7]

A.    **The Circuit Court did not err in denying Lafoga's HRPP Rule 48 Motion.**

Lafoga contends that the Circuit Court erred in denying his HRPP Rule 48[8] Motion.  Lafoga filed his Rule 48 Motion on

---

[7]    We have reordered, consolidated, and restated both defendants' points of error, for clarity.

[8]    HRPP Rule 48(b), Dismissal, provides:

**(b)  By court.**  Except in the case of traffic offenses that are not punishable by imprisonment, the court shall, on motion of the defendant, dismiss the charge, with or without prejudice in its discretion, if trial is not commenced within 6 months:

(continued...)

11

November 12, 2019.  On January 15, 2020, the Circuit Court filed its Findings of Fact, Conclusions of Law, and Order Denying Defendant Ines' Motion to Dismiss Indictment for Violation of Haw. R. Penal P. Rule 48 and Defendant Lafgoa's [sic] Motion to Dismiss for Violation of HRPP Rule 48 (**Order Denying Rule 48 Motion**).  Lafoga claims the Circuit Court erred in its Order Denying Rule 48 Motion by:  (1) concluding in Finding of Fact (**FOF**)/Conclusion of Law (**COL**) 39 that the Rule 48 commencement period began anew under Rule 48(b)(3), when Lafoga withdrew his guilty pleas on May 20, 2019, and the Circuit Court set a new trial date; and (2) excluding the time periods of six trial continuances that co-defendant Ines requested but Lafoga objected to, in FOF/COLs 18, 24, 28 and 40.  Lafoga's first contention is without merit, and we need not address his second contention regarding the continuances.[9]

In FOF/COL 39, the Circuit Court found:

> 39.  This Court finds that when Defendant Lafoga withdrew his guilty pleas on May 20, 2019, his case was reset for trial and that reset the starting date for the calculation of his HRPP Rule 48 clock to May 20, 2019. The time period

---

[8](...continued)
> (1) from the date of arrest if bail is set or from the filing of the charge, whichever is sooner, on any offense based on the same conduct or arising from the same criminal episode for which the arrest or charge was made; or
>
> (2) from the date of re-arrest or re-filing of the charge, in cases where an initial charge was dismissed upon motion of the defendant; or
>
> (3) from the date of mistrial, order granting a new trial or remand, in cases where such events require a new trial . . . .

[9]     The six continuances challenged by Lafoga are as follows:

> June 13, 2017 to September 18, 2017;
> September 18, 2017 to November 13, 2017;
> November 13, 2017 to January 1, 2018;
> January 1, 2018 to May 21, 2018;
> August 27, 2018 to January 21, 2019; and
> January 21, 2019 to May 6, 2019.

All of these continuances were granted before Lafoga pled guilty on April 12, 2019, and subsequently withdrew his guilty pleas on May 20, 2019.  Because we conclude infra that the Circuit Court correctly determined that Rule 48 was reset when Lafoga was given a new trial date on May 20, 2019, it is unnecessary to address these prior continuances.

> between May 20, 2019 and the time that Defendant Lafoga filed Lafoga's Motion on November 12, 2019, 183 days elapsed. However, the time period between July 1, 2019 and September 30, 2019, a total of 92 days, is excludable under HRPP Rule 48(c)(3). For the purposes of HRPP Rule 48, 88 days passed for Defendant Lafoga.

The Circuit Court concluded that when Lafoga withdrew his guilty pleas on May 20, 2019, and was given a new trial date, this event reset the starting date for the calculation of his HRPP Rule 48 clock to May 20, 2019, pursuant to HRPP Rule 48(b)(3). The Circuit Court also concluded that the time period between July 1, 2019 and September 30, 2019, a total of 92 days, was excludable under HRPP Rule 48(c)(3) (2019), which Lafoga does not contest. The Circuit Court determined that only eighty-eight days had passed, for purposes of HRPP Rule 48.

HRPP Rule 48(b)(3) provides for dismissal by the court if trial is not commenced "from the date of . . . [an] order granting a new trial." "It is well established that the withdrawal of a guilty plea, like the grant of a new trial, begins a new 120 day period in which the [prosecution] must bring a defendant to trial." Commonwealth v. Jensch, 469 A.2d 632, 636 (Pa. Super. Ct. 1983) (citations omitted); see Kennedy v. State, 763 S.W.2d 648, 649 (Ark. 1989) (holding that an order allowing the withdrawal of a guilty plea is analogous to an order granting a new trial). When the Circuit Court granted Lafoga's motion to withdraw guilty plea on May 20, 2019, the Circuit Court also had to set a new trial date for Lafoga at that time; and thus, the Circuit Court correctly concluded that Lafoga's HRPP Rule 48 clock started anew on May 20, 2019. See Choy Foo, 142 Hawaiʻi at 72, 414 P.3d at 124; Jensch, 469 A.2d at 636; Kennedy, 763 S.W.2d at 649. Accordingly, Lafoga's challenge to the denial of his HRPP Rule 48 Motion is without merit.

**B.  The Circuit Court's procedure of referring to the jurors by number and not by name, and of withholding the jurors' names and information from the defendants but not their counsels, did not constitute plain error under the circumstances of this case.**

Both Lafoga and Ines challenge the Circuit Court's modified jury selection procedure in this case, where the Circuit

Court provided counsels with the prospective jurors' names and information, but defense counsels were not to provide that information to the defendants.  The Circuit Court also required that during jury selection, the jurors be referred to by their juror numbers only, and not by their names.  The relevant record of the November 1, 2019 motions in limine hearing where the Circuit Court informed the parties of the procedure is as follows:

> THE COURT:  I do have one thing that I want to bring up.  250 juror questionnaires got sent out.  A great number of them have already been returned, and a good number of them have indicated that they are willing to serve for a good four to five weeks of trial.
>
> . . . .
>
> What the Court will do is, because those jurors already have numbers to them, 1 through 250, they will retain those numbers as we go through jury selection and trial.
>
> Once we get the full packet of jurors that will be summoned, <u>Counsel, of course will get that packet, identifying information will get redacted:  Phone numbers and street addresses</u>, which will get their zip codes and their towns, <u>but I'm also going to, and Court will redact their names as well</u>.
>
> So they will be referred to as juror No. 1, to and including juror No. 125, without saying Mr. Smith or Ms. Jones or Ms. Smith or Ms. Jones.  Any objection to that, Mr. [Prosecutor]?
>
> [INES'S COUNSEL]:  <u>Yeah, sorry, could you -- we're going to know the names from the list 'cause we're going to get them</u>.
>
> THE COURT:  <u>No</u>.
>
> [INES'S COUNSEL]:  <u>We're not going to know the names at all</u>?
>
> THE COURT:  <u>No, you just have the numbers</u>.
>
> [PROSECUTOR]:  I would --
>
> THE COURT:  When you do voir dire, it's juror No. 25 in chair No. 1.
>
> [INES'S COUNSEL]:  <u>So even the lawyers won't get the name</u>?
>
> [PROSECUTOR]:  <u>I do object to that because I think it's incredibly -- in my respectful opinion, I think it's dehumanizing</u>.
>
> THE COURT:  Well --

[PROSECUTOR]: And I think it's very important during voir dire to be able to get a juror's most candid and open answers.

I think calling them by number, I don't think that's conducive to creating an open environment.

[INES'S COUNSEL]: I do agree with Mr. [Prosecutor]'s concern. But if -- my concern is, we need to know who they are for our research purposes and preparing voir dire.

In other words, is there a conflict of interest or potential conflict of interest? Do I know the juror, that's what I'm mainly concerned about.

But if the Court prefers that we not say the juror's name on the record, and the Court instructs the jury that the Court has instructed the lawyers to approach it that way, then I don't have an objection.

THE COURT: How about that compromise, Mr. [Prosecutor]?

[PROSECUTOR]: I guess I just want to understand why.

THE COURT: I'm trying to head off a juror in this panel saying, I'm afraid to serve.

[INES'S COUNSEL]: I understand that concern.

So on the record, and this is what I suggest. The defense counsels -- the attorneys will look at the list and review and prepare for jury selection, but we both will not provide the list to our clients, but they will be present with us when we do jury selection.

THE COURT: Of course.

[INES'S COUNSEL]: So I think that takes care of all the concerns.

[PROSECUTOR]: I -- I really appreciate -- I understand why the Court is taking the step. I'm just not sure. I'm going to defer to the Court. I'm going to retract my objection.

[INES'S COUNSEL]: It's a weird thing to say, Hey, juror No. 1, juror No. 5, but if the Court explains to the jury the reason why it's doing it, and that it's not meant to be offensive.

THE COURT: I can explain that they're given numbers.

[INES'S COUNSEL]: Yes, the fact that they're just given numbers.

THE COURT: But I don't want to give them the Court's rationale as to why we're not referring to their names in court.

[INES'S COUNSEL]: That's understood.

THE COURT: I have, in the past, had to inform jurors to quell anxiety, that there's been no incidents whatsoever. I do believe that's the situation here, but I don't want it

15

to be raised in the entire panel's consciousness at all because we want them to serve.

[INES'S COUNSEL]: Yes. So as long as the Court explains to the jury that the Court has instructed the lawyers to refer to them as juror No. 1 or juror No. 2, et cetera, instead of using their names, I think both -- all of the parties' counsel will be protected in that way, in that the jury won't think that we're trying to, you know, take away their identity, I guess.

THE COURT: Don't worry, because the Court is the first one that has to voir die [sic] saying, Juror No. 1 and juror No. 2.

[INES'S COUNSEL]: So we'll all be doing it.

THE COURT: [Lafoga's Counsel], any other concerns you want to add to the record on this particular issue?

[LAFOGA'S COUNSEL]: So, Judge, I'm not sure I understand the situation. So will we know the names of each juror?

THE COURT: [Ines's Counsel] wants that to happen, and that's fine, as long as their names are not used on the record.

[LAFOGA'S COUNSEL]: Okay, 'cause that was my main concern was I think we should be entitled to know their names so that we can do proper research and look into people's background.

I know I've had cases with the prosecution before where they actually shoot over arrest and conviction information about jurors that -- I'm not saying you guys are going to do it, but I've had that happen in the past, and actually it comes in quite handy as far as jury selection and, you know, people's work with the Court.

So I would appreciate the chance to look a little more into the background of each juror, rather than just rely upon their sheet.

THE COURT: I think that's -- I think that's a fair request.

[LAFOGA'S COUNSEL]: Thank you, Judge.

THE COURT: And I think the proposal made by [Ines's Counsel] is a reasonable and workable one.

[LAFOGA'S COUNSEL]: Thank you.

THE COURT: So the list will come out to you, street addresses and telephone numbers still redacted.

[LAFOGA'S COUNSEL]: Yes.

THE COURT: But they will have their names on them.

But when we address those individual jurors in the box, just their number will be used, not their name.

[LAFOGA'S COUNSEL]: Yes. Thank you, Judge.

> THE COURT:  <u>So their name will not appear in the record</u>. . . .

(Emphases added).

The record reflects that initially, when the Circuit Court informed the parties during jury selection that they would not receive the names of the jurors, all parties raised objections and/or concerns.  The Circuit Court explained that it wanted to preemptively avoid jurors being "afraid to serve."  In the discussion that followed, Ines's counsel proposed a compromise where the Circuit Court would provide the names of the prospective jurors on the list to counsels, but that defense counsels would not provide the list to the defendants.  The Circuit Court found this acceptable; the State deferred to the Court, and retracted its objection.  Lafoga and Ines did not voice any further concerns or objections to the Circuit Court's modified procedure, which the Court summarized as:  "So the list will come out to you, street addresses and telephone numbers still redacted. . . . But they will have their names on them.  But when we address those individual jurors in the box, just their numbers will be used, not their name. . . .  So their name will not appear in the record."

During the pre-trial publicity screening of the prospective jurors on November 18, 2019, the Circuit Court explained to the prospective jurors that their juror numbers would be used to identify them:

> THE COURT:  Ladies and gentlemen, when [the clerk] did the initial roll call for this jury panel, each of you were given a card with your name on it along with your number.  Please remember that number, that is your number, and for the rest of the proceedings in this case you will be addressed by that number.  <u>Your actual names are known to the Court and to the attorneys</u>, and other than a sealed list that will be kept for court records, <u>no one else will know your actual names, so the public can't get your names and they cannot get your contact information, so only court and counsel will have your names</u>.  For the rest of the proceedings you'll be addressed by your number.

(Emphases added).  The Circuit Court told the jurors that only the "court and counsel will have your names."  The Court did not state whether or not the defendants themselves were privy to the

jurors' names, and specifically only mentioned "attorneys" or "counsel."

When jury selection began on November 20, 2019, the Circuit Court again informed the prospective jurors of the use of numbers rather than their names, stating:

> THE COURT: And, again, to make sure that we have a fair and impartial jury, the Court and then later on tomorrow the attorneys will have the opportunity to speak with you. It's a question and answer session. We'll be asking you questions about your personal background, your employment, your family and your experiences. Do not think that we're trying to pry into your personal affairs. We're just trying to get to know you better and to determine whether or not you're actually fit to serve as trial jurors in this case.
>
> If it seems like we have some information about you, it's because we have copies of your juror summons cards. Your personal identifying information has been redacted or blacked out, so we don't have your telephone numbers, we don't have your street addresses. And as I told you on Monday, only the attorneys and the Court have your actual names. For the rest of the public that do not have access to the sealed court records, all they will know about the jurors that serve in this case are the numbers that we call here in court. So you'll forever now, in this case, be known by your number. Don't be surprised though that we still have some information about what kind of work history you have and whether or not you served as a juror before, because we do have that information, so don't be surprised.

(Emphases added). The Court reiterated that "only the attorneys and the Court have your actual names." The Court again did not state whether or not the defendants themselves were privy to the jurors' names, and specifically only mentioned "attorneys."

Before opening statements on November 22, 2019, the Circuit Court pointed out the presence of the media and reminded the empaneled jury that their names were not "public," as follows:

> THE COURT: Ladies and gentlemen, also, as we continue through this trial, you are going to be referred to by your juror number as well as your chair number. Your names are not made part of the public record of this case. You already see that there is a camera here in the courtroom. While they are permitted to cover the proceedings, the press is not allowed to have any likeness of yours, so they can't take any pictures of you, they cannot take any video of you, they cannot depict the jury in this case. So in addition to your names, your likeness will not be made part of the public record or available to the public in any way in this case.

18

(Emphases added).  The Circuit Court's emphasis at this juncture focused on the jurors' names not being a part of the public record in this case.  The Court did not reiterate that only the Court and the attorneys had the jurors' names.

On appeal, both defendants raise distinct "anonymous jury" challenges to the modified jury selection procedure the Circuit Court employed in this case.  Lafoga challenges the propriety of the Circuit Court referring to the jurors by number and not by name.  Ines frames his challenge as the jury being fully "anonymous" to the defendants but not to their counsels.  We address each challenge separately.

**1.    Lafoga's challenge to the Circuit Court's "confidential" jury procedure of referring to the jurors by number and not by name, did not constitute plain error under the circumstances of this case.**

Lafoga contends that the Circuit Court erred by ordering that the jury would be "partially anonymous, with jurors being referred to by number rather than by name," without first determining that the jury needed "the protection of anonymity," and "without taking sufficient precautions to minimize any prejudicial effects on Lafoga's presumption of innocence."  Because Lafoga's trial counsel did not object, Lafoga urges this court to notice plain error because the "partially anonymous jury" procedure affected his substantial, constitutional right to a presumption of innocence.

We first clarify the nature of Lafoga's challenge to the jury procedure.  A "confidential" jury is "intended to limit the jurors' exposure to the media," and the jurors' names are "withheld from the public but not the parties."  United States v. Harris, 763 F.3d 881, 886 (7th Cir. 2014) (citation omitted).  A confidential jury challenge "focuses on whether access to the courts has been properly denied."  Id.  Lafoga, however, does not raise any access-to-the-courts challenge on appeal.

"[A]nonymous juries are for the jurors' protection," and the parties and the public do not know their names.  Id.  In an "anonymous jury" situation, the jurors' "identifying

information – such as names, occupations, addresses, exact places of employment, and other such facts – has been <u>withheld from the parties</u> in order to protect potential jurors and their families." Id. at 884 (citing United States v. Morales, 655 F.3d 608, 620 (7th Cir. 2011)) (emphasis added).  This means that none of the parties, including their attorneys, have the jurors' names and information.  See, e.g., United States v. Ross, 33 F.3d 1507, 1521 n.27 (11th Cir. 1994) ("anonymous" jury where the jurors' names, addresses, employment, and other personal information <u>were not disclosed to the parties</u>, including "<u>the government and the defense attorneys</u>.") (emphases added).  Here, however, the jurors' names and information were not withheld fully from the parties, because the State and defense counsels had all the information.

         Lafoga relies on federal and state "anonymous jury" cases of United States v. Ross, id., and State v. Samonte, 83 Hawaiʻi 507, 928 P.2d 1 (1996), to support his argument that referring to the jurors by number and not by name was prejudicial.  In Ross, the Eleventh Circuit addressed the empaneling of an anonymous jury and adopted the following principles from the Second Circuit:  "In general, the court should not order the empaneling of an anonymous jury without (a) concluding that there is strong reason to believe the jury needs protection, and (b) taking reasonable precautions to minimize any prejudicial effects on the defendant and to ensure that his fundamental rights are protected."  33 F.3d at 1520 (citing United States v. Paccione, 949 F.2d 1183, 1192 (2d Cir. 1991)).  The Ross court concluded that the trial court did not abuse its discretion in ordering the anonymous jury because, as to the first prong, there was "strong reason to believe the jury need[ed] protection" where appellant was the leader of a "large-scale criminal organization" and was actively involved in organized crime; the organization had the means to harm jurors; appellant had previously attempted to interfere with the judicial process; and appellant also faced the possibility of a life sentence and extensive monetary penalties.  Id. at 1520-21.  As to the second prong, the Ross court concluded the trial court

20

"took reasonable steps to minimize any prejudicial effects" on the appellant to ensure that his fundamental rights were protected. Id. at 1521.

In Samonte, the Hawaiʻi Supreme Court addressed circumstances where some of the jurors' personal information (i.e., the jurors' first names, spouse's names, street addresses and identity of the jurors' employers) were withheld from the parties after a jury tampering incident during Samonte's second trial;[10] however, the parties still had the last names and street name of the jurors' residences, their occupations, their marital status and number of children, number of years of education completed, and town and zip code of the residences, date of birth and number of years of residence in the state. 83 Hawaiʻi at 520-21, 928 P.2d at 14-15. The Samonte Court considered pertinent federal authority on the issue, and applied the same "test" from Ross and Paccione, to determine whether the trial court was "correct" to empanel an anonymous jury:

> In general, the court should not order the empaneling of an anonymous jury without (a) concluding that there is strong reason to believe that the jury needs protection, and (b) taking reasonable precautions to minimize any prejudicial effects on the defendant and to ensure that his [or her] fundamental rights are protected. Within these parameters, the decision whether or not to empanel an anonymous jury is left to the [trial] court's discretion.

Samonte, 83 Hawaiʻi at 520, 928 P.2d at 14 (quoting Paccione, 949 F.2d at 1192). The Court upheld the use of the "partially anonymous" jury procedure under the circumstances of that case. Id. at 523, 928 P.2d at 17.

Here, the Circuit Court imposed a confidential jury procedure with limited jury anonymity, only for the defendants but not for their counsels. Given the nature of the procedure employed by the Circuit Court and Lafoga's arguments on appeal, we conclude the general rule of Samonte addressing anonymous jury procedures applies to the jury procedure employed in this case.

---

[10] In the second trial, two jurors had been contacted by "anonymous persons" urging them to convict defendant, resulting in a mistrial. Samonte, 83 Hawaiʻi at 520, 928 P.2d at 14.

**Whether the Circuit Court had a strong reason to believe that the jury needed protection**

As to the first Samonte criteria, the record does not reflect that there was a "strong reason to believe that the jury need[ed] protection[.]" Id. at 520, 928 P.2d at 14 (emphasis added).

> Sufficient reason for empaneling an anonymous jury has been found to exist upon a showing of some combination of several factors, including: (1) the defendant's involvement in organized crime, (2) the defendant's participation in a group with the capacity to harm jurors, (3) the defendant's past attempts to interfere with judicial process, (4) the potential that, if convicted, the defendant will suffer a lengthy incarceration and substantial monetary penalties, and (5) extensive publicity that could enhance the possibility the jurors' names would become public and expose them to intimidation or harassment.

Id. (quoting Ross, 33 F.3d at 1520). The record reflects that the Circuit Court concluded that jury confidentiality was needed for this case, as the Circuit Court anticipated jurors expressing fear or anxiety about their jury service. The Circuit Court, however, did not articulate any grounds for its concern that were specific to this case or to these defendants. When the prosecutor asked the Court why it felt the jurors' names should be withheld, the Court explained that it was "trying to head off a juror in this panel saying, I'm afraid to serve." In response, Ines's counsel acknowledged: "I understand that concern," and proposed a compromise that all parties and the Court found acceptable. The Circuit Court then indicated that "in the past," the Court "had to inform jurors to quell anxiety" and stated "I do believe that's the situation here . . . ." The State, Lafoga, and Ines did not object to, or refute, the Court's expressed concern and belief of juror anxiety or fear related to their service in this particular case. We conclude that the Circuit Court's belief that jurors may feel anxiety or fear, in the absence of other stated reasons including "some combination" of the factors set forth in Samonte, was insufficient to establish a "strong reason to believe that the jury needs protection" to justify the modified jury procedure used in this case. Id. at 520, 928 P.2d at 14 (emphases added). Although the Circuit Court did not articulate a strong basis to meet the first Samonte

criteria, the parties did not refute the Court's concern about juror anxiety or fear of serving in this case, and instead conferred with the Court on appropriate procedures to follow.

### Whether the Circuit Court took reasonable precautions to minimize any prejudicial effects on the defendant

As to the second <u>Samonte</u> criteria, the record does reflect that the Circuit Court took "reasonable precautions to minimize any prejudicial effects on the defendant[.]" <u>Id.</u> The Hawai'i Supreme Court explained what steps a trial court should take to minimize such prejudice, as follows:

> When a trial court empanels an anonymous jury, we would normally prefer that the trial court address the burden that a completely anonymous[11] jury imposes on a criminal defendant's presumption of innocence by the trial court's giving jurors an instruction that further minimizes the significance of their anonymity. <u>The trial court should give anonymous jurors a plausible and nonprejudicial reason for not disclosing their identities that decreases the probability that the jurors would infer that the defendant is guilty or dangerous (e.g., the trial court could instruct the jurors that the purpose for juror anonymity is to protect the jurors from contacts by the news media, thereby implying that juror anonymity is not the result of threats from the criminal defendant)</u>.

<u>Id.</u> at 522, 928 P.2d at 16. (emphasis and footnote added).

Here, the Circuit Court administered a neutral announcement, which was agreed to by the State, Lafoga, and Ines, that the prospective jurors would be referred to by number and not by name. The Circuit Court explained to the jury that if it appeared that the parties had some information about them, it was because they had copies of their names and juror information cards with their telephone numbers and street addresses redacted. The Circuit Court informed the jurors that the public would not have access to their names and contact information, and that such information was not made part of the public record of the case. When the media appeared, the Circuit Court allayed the jury's concerns by explaining that while the media was permitted to cover the proceedings, the jurors' names were not part of the

---

[11] This case did not involve a "completely anonymous" jury because defense counsels had the jurors' names and information.

public record, and the media was not allowed to take any pictures or videos of them. While the Circuit Court mentioned that only itself and the "attorneys" had the jurors' names, we conclude that the omission of a similar reference to the defendants themselves having such information was not prejudicial in this case, where the defendants were present with their counsels throughout the jury selection, and heard and saw the questioning of all of the prospective jurors.

The record reflects that there was no basis upon which the jurors could infer that the Circuit Court's procedure was anything other than a policy that respected and sought to protect the jurors' privacy from the general public and the media, that had nothing to do with the guilt or potential dangerousness of either defendant. See id. The record does not show that the jury would necessarily draw, or was likely to draw, an adverse inference of guilt or of dangerousness against either defendant. The Circuit Court gave the jurors "a plausible and nonprejudicial reason" for not disclosing their identities on the record and adequately addressed any possible "prejudicial effects" on the defendants. Id. at 520, 522, 928 P.2d at 14, 16. Thus, the second Samonte criteria of minimizing any potential prejudice to the defendants was met. The Samonte Court was concerned with "the burden that a completely anonymous jury imposes on a criminal defendant's presumption of innocence[.]" Id. at 522, 928 P.2d at 16 (emphasis added). This case did not involve a "completely anonymous" jury where all information about the jurors was withheld from defendants and their counsel. This case involved limited juror anonymity -- anonymity only for the public and the defendants, but not for defense counsels. "Considering the totality of the circumstances" in this particular case, which did not involve a completely anonymous jury, and where the Circuit Court gave a plausible and nonprejudicial explanation for the confidentiality of the jurors' names -- we conclude the

Circuit Court's modified jury procedure did not constitute plain error.[12]  Id. at 520, 523, 928 P.2d at 14, 17.

> **2.    Ines's challenge to the Circuit Court's "anonymous-to-the-defendants" jury procedure did not constitute plain error under the circumstances of this case.**

Ines contends that the Circuit Court's procedure violated HRS § 612-18(c)[13] and Ines's right to a fair trial, because the Court "sua sponte ordered juror anonymity for [Ines]," and that "[Ines] personally, had no information regarding any of the potential jurors, including name and background information."  Ines argues that the Circuit Court's procedure was "a prophylactic measure without a basis in fact" that deprived Ines of his substantial right to a fair trial, which should be noticed as plain error where "the trial court, sua sponte, raised the issue without prior notice to any of the parties which required on the fly decisions."  In response to the State's argument that Ines's unpreserved claim of error should be waived, Ines further argues in his Reply Brief that:

> There was no incident which prompted the trial court's action. There were no concerns stated by prospective jurors. There was no warning of the trial court's intention to not comply with Section 612-18(c), HRS, which necessitated rushed and immediate decisions on the part of counsel.  The empaneling of an anonymous jury denied Ines of a fair trial and amounted to plain error.

"Normally, an issue not preserved at trial is deemed to be waived."  State v. Fagaragan, 115 Hawaiʻi 364, 367-68, 167 P.3d 739, 742-43 (App. 2007) (citation omitted).  The record

---

[12]    Although we do not find plain error in this case, a confidential or anonymous procedure is an exception to general jury selection procedures which are, by statute, not anonymous.  See discussion infra.  Any deviation from the general jury selection procedures set forth in HRS Chapter 612 should be undertaken in a careful exercise of discretion, observing the general statutory prohibition against anonymous juries and the two-part Samonte criteria to justify such a procedure.

In light of our resolution of Lafoga's contention, we need not address Lafoga's claim of ineffective assistance of counsel.

[13]    HRS § 612-18 (1993 & Supp. 2014), entitled "Trial jury; additional requirements," subsection (c) provides:  "The names of prospective jurors to be summoned to sit as a jury, and the contents of juror qualification forms completed by those jurors, shall be made available to the litigants concerned."

reflects that objections and concerns were raised by all counsel to the initial fully anonymous jury procedure, where the parties, including counsels would not have the names. The discussion regarding counsels' concerns resulted in the Circuit Court scaling back its original proposed procedure to one where all counsels, but not the defendants, would have the names, to which all parties agreed. The specific objection Ines now raises on appeal that the jury was fully anonymous to the defendants, was not raised below, and we review for plain error. See Barnes, 145 Hawaiʻi at 218, 450 P.3d at 748. While we agree with Ines that the Circuit Court's procedure did not comply with HRS § 612-18(c), we nevertheless conclude, as explained infra, that there was no plain error under the circumstances of this case.

HRS § 612-18(c) requires that the names and the contents of the jurors' qualification forms "shall be made available to the litigants concerned." (Emphasis added). The term "litigant" is not defined by HRS Chapter 612. A court may "resort to legal or other well accepted dictionaries as one way to determine the ordinary meaning of certain terms not statutorily defined." Wells Fargo Bank, N.A. v. Omiya, 142 Hawaiʻi 439, 449-50, 420 P.3d 370, 380-81 (quotation marks and citations omitted). A "litigant" means, "[a] party to a lawsuit; the plaintiff or defendant in a court action, whether an individual, firm, corporation, or other entity." *Litigant*, Black's Law Dictionary 1119 (11th ed. 2019) (emphasis added). Thus, because the term "litigant" in the statute refers to the defendants themselves, it was not sufficient to merely provide the names and information to defense counsels. The Circuit Court's procedure in this case did not comply with HRS § 612-18(c).

HRS Chapter 612 deals with "Jurors," and includes HRS § 612-23, entitled "Challenging Compliance with Selection Procedures." "HRS § 612-23 provides litigants with the exclusive statutory method of challenging the selection of grand or trial juries for non-compliance with the requirements of HRS Chapter 612." State v. Villeza, 85 Hawaiʻi 258, 265, 942 P.2d 522, 529 (1997). HRS § 612-23 (1993) provides:

> (a) Promptly after the moving party discovered or by the exercise of diligence could have discovered the grounds therefor, and in any event before the trial jury is sworn to try the case, a party may move to stay the proceedings, and in a criminal case to quash the indictment, or for other appropriate relief, <u>on the ground of substantial failure to comply with this chapter in selecting the</u> grand or <u>trial jury</u>.
>
> (b) Upon motion filed under subsection (a) containing a sworn statement of facts which, if true, would constitute a substantial failure to comply with this chapter, the moving party is entitled to present in support of the motion the testimony of the clerk, any relevant records and papers not public or otherwise available used by the clerk, and any other relevant evidence. <u>If the court determines that</u> in selecting either a grand jury or a trial jury <u>there has been a substantial failure to comply with this chapter and that the moving party has been prejudiced thereby, the court shall stay the proceedings</u> pending the selection of the jury in conformity with this chapter, <u>quash an indictment, or grant other appropriate relief</u>.
>
> (c) <u>The procedures prescribed by this section are the exclusive means by which a person accused of a crime</u>, the State, or a party in a civil case <u>may challenge a jury on the ground that the jury was not selected in conformity with this chapter</u>.

(Emphases added). To obtain relief, the statute requires a showing of "substantial failure to comply with this chapter" and a showing of "prejudice." <u>Id.</u>

In <u>Villeza</u>, the defendant challenged the trial court's redaction of potential jurors' addresses and phone numbers from the juror qualification forms, by filing a motion to quash the indictment. 85 Hawaiʻi at 261-62, 942 P.2d at 525-26. The <u>Villeza</u> Court held that "[t]he partial redaction of the juror qualification forms did not amount to a substantial failure to comply with HRS Chapter 612." <u>Id.</u> at 264, 942 P.2d at 528. "[T]o obtain relief under HRS § 612-23, the moving party must show a *substantial* failure to comply with the law and that the party has been prejudiced thereby." <u>Id.</u> at 265, 942 P.2d at 529 (quotation marks, brackets and citation omitted). Noting that "[t]he prospective jurors' streets [sic] addresses and phone numbers were unnecessary to any appropriate pretrial investigation[,]" the Court held that "the mere redaction of street addresses and telephone numbers did not lose, destroy, or sacrifice Villeza's constitutional right to a presumption of

innocence and an impartial jury."  Id. at 266, 942 P.2d at 530 (citing Samonte, 83 Hawaiʻi at 523, 928 P.2d at 17).

Here, no motion for relief was filed, as required by HRS § 612-23(a) and (c).  Even if such a motion had been filed, we conclude that relief would not be warranted because the non-compliance with HRS § 612-18(c) was not substantial, where defense counsels had the jurors' names and information, and where both defendants were present during the entire jury selection questioning.  See HRS § 612-23(b); Villeza, 85 Hawaiʻi at 265, 942 P.2d at 529.  Nor does the record reflect that either defendant was prejudiced by this procedure, in light of the neutral manner in which the procedure was implemented and explained to both the prospective jurors and the trial jurors who were ultimately selected.  See Villeza, 85 Hawaiʻi at 265, 942 P.2d at 529.  We conclude that, under the circumstances of this case, Ines's right to a fair trial was not violated, and the Circuit Court's anonymous-to-the-defendants jury procedure did not constitute plain error.  See Samonte, 83 Hawaiʻi at 520, 928 P.2d at 14.

   **C.  As to Lafoga, the Circuit Court did not err in refusing to instruct the jury on included offenses below the Attempted Murder offense.**

Lafoga contends that in Count 2, Attempted Murder, the Circuit Court erred when it refused to instruct the jury on the included offenses of Assault in the First Degree (**Assault First**), and Assault in the Second Degree (**Assault Second**).  Lafoga argues that the Circuit Court had a duty to instruct the jury on any included offenses "if there was a rational basis for the jury to acquit Lafoga of Attempted Murder in the Second Degree" and convict him of an included assault offense.

"Jury instructions on lesser-included offenses must be given where there is a rational basis in the evidence for a verdict acquitting the defendant of the offense charged and convicting the defendant of the included offense."  State v. Kaeo, 132 Hawaiʻi 451, 465, 323 P.3d 95, 109 (2014) (quoting State v. Flores, 131 Hawaiʻi 43, 51, 314 P.3d 120, 128 (2013)).  Thus, the Circuit Court's obligation to instruct the jury on

Assault First and Assault Second depends on whether there was a rational basis in the evidence presented for the jury to acquit Lafoga of Attempted Murder and convict him of Assault First or Assault Second.

The Circuit Court explained its refusal to instruct the jury on the included assault offenses as follows:

> THE COURT:  <u>The Court's going to refuse instructing on the included offenses in Count No. 2 . . . .  But given the facts of this case, the Court concludes that Assaults in the First, Second, and Third Degree are not applicable pursuant to</u> <u>*State v. Moore*</u><u>, 82 Hawaii 202, a 1996 case</u>.
>
> . . . .
>
> <u>In this case, the Court finds that the reasoning in</u> <u>*Kaeo* is not applicable because there is no evidence for the jury to find that Lafoga's intent was to only hurt the complaining witness</u>.  As stated, even if there was such testimony, the Court would nevertheless decline an instruction on included offenses.  <u>The evidence in this case includes the stated intent to kill, the initial shot to the face, and three more shots to the body where whenever the complaining witness showed any signs of life</u>. And these facts prohibits a rational basis to find an alternate mens rea.  Simply put, <u>to conclude a state of mind other than the conscious object to cause the death of Kele Stout in this case would beggar belief</u>.
>
> So for those reasons, the Court would refuse instructing on the included offenses of Assault 1, Assault 2, and Assault 3 for Count No. 2.

(Emphases added).

In <u>State v. Moore</u>, 82 Hawaiʻi 202, 211-12, 921 P.2d 122, 131-32 (1996), the Hawaiʻi Supreme Court held that included offense instructions for first-degree and second-degree assault were not supported by the evidence in a second-degree attempted murder case, where Moore fired at least six shots at his wife from "point-blank range," causing five gunshot wounds to the upper body, with three in vital areas, where Moore waited thirty minutes to get help for his wife, and made no attempt to administer first aid.  The <u>Moore</u> Court concluded:  "[t]here is no evidence . . . from which a reasonable juror could rationally infer that Moore contemplated a result other than [the victim's] death."  <u>Id.</u> at 212, 921 P.2d at 132.  Lafoga argues that, rather than <u>Moore</u>, this case was factually closer to <u>State v. Smith</u>, 91 Hawaiʻi 450, 984 P.2d 1276 (App. 1999), in which this court held

that the jury should have been instructed on the included offense of assault for three counts of second-degree attempted murder against three victims.  In Smith, the defendant fired one shot to the upper belly of the first victim, one shot to the back of the second victim, and two shots at the third victim, only one of which hit the third victim in the back.  Id. at 454, 467, 984 P.2d at 1280, 1293.  The Smith court noted that Smith did not make any further attempts to injure or kill the victims, that Smith had made statements indicating he "wanted to shoot" the victims and teach them a lesson, but Smith did not indicate whether Smith intended to cause the death of the victims or cause serious or substantial injury to them.  Id.

Lafoga argues that this case is "closer to Smith than to Moore" because the jury could have found that Lafoga fired only the first shot at Stout and not the rest, and if the jury so found, then there was a rational basis for a juror to conclude that Lafoga's intent was to cause serious or substantial injury rather than death.  Lafoga asserts that "a theory that Lafoga did not fire all of the gunshots at Stout would have undercut the trial court's assessment of the evidence and its refusal to instruct the jury on assault."  In support of this alternative "second shooter" theory, Lafoga points to excerpts of testimony that he claims show the possibility of a second shooter in the passenger seat of the van, that Stout was unable to see.[14]

---

[14]    Lafoga argues that:

When Lafoga was driving the van with Stout in the back, he stopped somewhere, bragged about the beating to someone, and that third person then looked in the back window.  Stout testified that he did not believe a third person had entered the van, but a juror might reasonably conclude that Stout simply did not detect such a person.  A DPA asked Stout: "Could you also see the passenger side?"  Stout testified: "I was directly behind the driver – I mean the passenger seat, so I could not."  The DPA asked him:  "Do you know if – at that point in time if anybody else had gotten into the van?"  Stout replied:  "If they did, they were really silent, but I don't believe so."  Stout testified that, in a previous statement, he had stated that the tools in the van had impeded his view of the person who had shot him.  After Stout was shot in the face, assuming that Lafoga was one who did that, he rolled onto his stomach.  This testimony, combined with Steinemann's testimony that Stout had gunshot

(continued...)

Lafoga's theory and argument on appeal that "an undetected passenger could have fired the second, third, and fourth shots," after Lafoga fired the first shot to Stout's face, is not supported by the evidence, or reasonable inferences from the evidence.  Before Lafoga fired the first shot to Stout's face, the evidence reflects that Lafoga made a stop while driving the van; at this stop Lafoga was talking and bragging to someone about what they did to Stout; and the person Lafoga was speaking to, came to the back window of the van to look inside.  Stout testified that the van doors were not opened at that point:

> A.    [(BY STOUT)] Eventually we stop somewhere and the driver starts talking to some person he meets there, starts bragging about what they've done to me, mentions that it was him and [Ines], and then goes and tells the person to go look through the back window.
>
> Q.    [(BY PROSECUTOR)] And did you see anybody come to the back window?
>
> A.    I saw a figure, but I didn't get a good look at anyone.
>
> Q.    So the doors weren't opened or anything like that?
>
> A.    No.
>
> Q.    What happens next after that?
>
> A.    From there, just start driving again. I think around this point the driver starts talking to me.

(Emphases added).  Stout testified he "d[id]n't believe" that someone else got into the van at that point:

> Q.    [(BY PROSECUTOR)]  After you were taken into the van, how many people got into the van?
>
> A.    [(BY STOUT)]  Just the driver.

---

[14](...continued)
wounds in his back, his buttocks, and his leg, could lead a reasonable juror to infer that Stout, while on the floor of the van, was facing the rear doors and did not see the shooter of the second, third, and fourth shots.  With the van being driven by Lafoga during those subsequent shots, a reasonable juror could have inferred that an undetected passenger could have fired the second, third, and fourth shots, especially with tools in the van as obstacles.  This passenger would have exited the van when Lafoga did so.

Lafoga's Opening Brief, at 28 (emphases added) (docket citations omitted).

Q.     And as you were driving, you had indicated that at some point you had been driven to a location where there was another male that -- or another person, rather, excuse me, that had come to the rear of the van and peered into the window; is that right?

A.     Yes.

Q.     Do you know if -- at that point in time if anybody else had gotten into the van?

A.     If they did, they were really silent, but I don't believe so.

(Emphases added).  Stout also testified that there was not anyone else in the van besides himself and Lafoga:

A.     [(BY STOUT)]  Only when he came up towards the back to peer inside.

Q.     [(BY INES'S COUNSEL)]  Prior to him coming up to peer inside, you could not tell how close or far he was from the van?

A.     Correct.

Q.     'Cause you couldn't see?

A.     Correct.

Q.     You can't even tell if this person got into the van or didn't get into the van; is that correct?

A.     I'd have heard the passenger door open and shut. I'm on the passenger side.

Q.     So it's your belief and testimony as you sit here today that there was not a third person in the van?

A.     Correct.

(Emphases added).  The record shows that Lafoga's argument that there was an undetected passenger in the van, who could have fired the second, third and fourth shots at Stout, is not supported by the evidence.

The Circuit Court cited Lafoga's stated intent to kill, initial shot to Stout's face, and firing "three more shots" at Stout's body whenever Stout "showed any signs of life," as evidence refuting any rational basis for a jury acquittal of Attempted Murder.  The record supports the Circuit Court's conclusion.  Both Stout and Lafoga's ex-girlfriend DeCosta testified that Lafoga said Stout was the first person Lafoga would kill.  Stout testified that Lafoga first shot Stout in the face, then turned and shot Stout in the torso and buttock as

Lafoga was driving.  Lafoga told DeCosta that he shot a man in the van, the man was begging and choking on his blood, Lafoga told the man to shut up, and Lafoga turned around and shot the man.  Lafoga told DeCosta the man was dead, and Lafoga was going to burn the van.  Stout also heard Lafoga tell someone on the phone that Lafoga was trying to burn the van with Stout's body still in it.

Stout could "only recall three shots," but Dr. Steinemann testified that Lafoga had at least four gunshot wounds, to his scalp, jaw, torso, pelvis/rectum area, right femur/hip bone, and left thigh.  The two wounds that would have been fatal if Stout had not received treatment, were the pelvis/rectum wound and the jaw wound with the bullet still in the left side of Stout's head.  These life-threatening wounds corresponded to Stout's testimony that Lafoga shot him in the face, torso, and buttock.

Lafoga points to DeCosta's testimony that:  Lafoga told DeCosta that "he and Tonez took [Stout] up the valley;" that Tonez was supposed to stay by the van and watch it; and that Tonez also shot Stout.  Lafoga claims on appeal that DeCosta's testimony raises the possibility that Tonez "also shot Stout," and that Tonez could be the source of the fourth shot Dr. Steinemann testified to.  Even if the evidence shows a possibility that Tonez may have fired a fourth shot at Stout, the remaining evidence -- Lafoga's verbal intent to kill, Lafoga's three shots to Stout's face, torso and buttock causing life-threatening injuries, Lafoga's statements that Stout was dead and that he would burn the van with Stout's body in it -- would preclude a reasonable juror from rationally inferring that Lafoga intended a result other than Stout's death.  See Moore, 82 Hawaiʻi at 212, 921 P.2d at 132.  Thus, there was no rational basis in the evidence for the jury to acquit Lafoga of Attempted Murder and convict him of either Assault First or Assault Second Degree, and consequently the Circuit Court did not err in refusing to instruct on the assault offenses.  See Stanley, 148 Hawaiʻi at 500, 479 P.3d at 118; Kaeo, 132 Hawaiʻi at 465, 323 P.3d at 109; Moore, 82 Hawaiʻi at 212, 921 P.2d at 132.

D.      **As to Ines, the Circuit Court did not err in refusing to instruct the jury on offenses below Accomplice to Attempted Murder and Conspiracy to Commit Murder.**

As to Ines, the Circuit Court instructed the jury on Conspiracy to Commit Murder in Count 3, as an included offense to Accomplice to Attempted Murder in Count 1, consistent with <u>State v. Reyes</u>, 5 Haw. App. 651, 706 P.2d 1326, <u>reconsideration denied</u>, 5 Haw. App. 683, 753 P.2d 253 (1985) (holding that conspiracy to commit murder is an included offense to accomplice to attempted murder).[15]  Ines contends that the jury instructions were erroneous because the Circuit Court refused to give the included offense instruction that Ines requested, for Instruction Nos. 7, 9, and 11 for Criminal Conspiracy to Commit Assault in the First Degree, Second Degree and Third Degree (**Conspiracy to Commit Assault 1, 2, and 3**)[16] and included offense instructions for

---

[15]     In <u>Reyes</u>, this court held that, under HRS § 701-109 (Method of Prosecution when Conduct Establishes an Element of More than one Offense), and § 705-531 (Multiple Convictions), the trial court may not allow the jury to find a defendant guilty of being an accomplice to an attempted murder **and** of conspiracy to commit the same murder, and that the conspiracy count should be treated as an included offense to accomplice to attempted murder.  5 Haw. App. at 658, 706 P.2d at 1330.  The <u>Reyes</u> court stated:  "if both counts are submitted to the jury, the jury must be instructed that it may decide the conspiracy count only in the event it does not find the defendant guilty of the accomplice to attempted murder count."  <u>Id.</u> (citations omitted).

[16]     Ines's proposed Instruction No. 7 stated:

9.15 CRIMINAL CONSPIRACY ASSAULT IN THE FIRST DEGREE

If and only if you find Ranier Ines not guilty of attempted murder in the second degree as an accomplice or a conspirator or you are unable to reach a unanimous verdict as to accomplice liability or the conspiracy, then you must consider whether Ranier Ines is guilty or not guilty of criminal conspiracy to commit assault in the first degree.

A person commits the offense of criminal conspiracy if, with intent to promote or facilitate the commission of a crime, he agrees with one or more persons that one or more of them or they will engage in or solicit a substantial step in committing assault in the first degree, and he, a person who had joined the agreement, commits an overt act for the purpose of carrying out the agreement.

There are three material elements of the offense of criminal conspiracy, each of which the prosecution must prove beyond a reasonable doubt.

(continued...)

[16](...continued)
These three elements are:

1. On or about September 16, 2015, in the City and County of Honolulu, Ranier Ines agreed with one or more persons that one or more of them or they would engage in assault in the first degree; and

2. While the agreement was in effect, Ranier Ines, a person who had joined the agreement committed one or more of the following overt acts for the purpose of carrying out the agreement:

    a. Ranier Ines restrained Kele Sout at gunpoint.

    b. Ranier Ines called Brandon Lafoga.

    c. Ranier Ines told Brandon Lafoga to get ready because Ranier Ines was bringing someone who needed a beating.

    d. Ranier Ines instructed Kele Stout to drive to a residence in Waianae, and he did so at gunpoint.

    e. Ranier Ines and Brandon Lafoga beat Kele Stout while Kele Stout's hands were bound.

and

3. Ranier Ines joined in the agreement with intent to promote or facilitate the commission assault in the first degree, and the overt acts were also committed with such intent.

    A person commits the offense of Assault in the First Degree if he intentionally or knowingly causes serious bodily injury to another person.

    There are two material elements of the offense of Assault in the First Degree, each of which the prosecution must prove beyond a reasonable doubt.

These two elements are:

1. On or about September 16, 2015, in the City and County of Honolulu, the defendant caused serious bodily injury to another person; and

2. The Defendant did so intentionally or knowingly.

    In order to find the Ranier Ines guilty, you must unanimously agree as to the particular overt act committed.

Ines's proposed Instruction No. 9, "Criminal Conspiracy Assault in the Second Degree" contained substantially similar wording, with references to "assault in the first degree" changed to "assault in the second degree," and providing the definition of assault in the second degree at the end of the instruction. Ines's proposed Instruction No. 11, for "Criminal Conspiracy Assault in the
(continued...)

Assault in the First, Second, and Third Degrees (**Assault 1, 2, and 3**) for Accomplice to Attempted Murder in Count 1.[17]  Ines argues that there was "a rational basis in the evidence to acquit Ines" of Accomplice to Attempted Murder and Conspiracy to Commit Murder, and to convict him of the included offenses of Conspiracy to Commit Assault 1, 2, and 3, or Assault 1, 2, and 3.

The Circuit Court refused Ines's requested instructions for Conspiracy to Commit Assault 1, 2 and 3, reasoning that these offenses were not included offenses of Conspiracy to Commit Murder, as follows:

> The Court will respectfully deny the request to include included offenses for Count No. 3, Conspiracy to Commit Murder in the Second Degree.  Criminal liability for conspiracy is predicated on the agreement of the defendants to commit murder and not any other offense.  The kernel of the crime is in the meeting of the minds of both defendants to cause the death of Kele Stout, and the commission of an overt act is just manifestation of the agreement.
>
> Logically to this Court a meeting of the minds cannot exist for different desired results.  There can be an agreement for one purpose, and in this case it is causing the death of Kele Stout.
>
> No case law is on point in Hawaii.  But the California Court of Appeals persuasively holds that conspiracy is a crime distinct from the substantive offense that is its object.  It does not require commission of the substantive offense.  The conspiratorial agreement is itself the essence of the crime and is what it seeks to punish.  That is why once one of the conspirators has performed the overt act in furtherance of the agreement, the association becomes an active force.  It is the agreement, not the overt act, which is punishable.  Hence the overt act need not amount to a criminal attempt and it need not be criminal in itself. . . .
>
> Further, even though the pled overt acts might encompass an included offense to murder, the charged language specifies a single conspiratorial agreement of the defendants to cause the death of Kele Stout.  And because the conspiratorial agreement is the true crime, conspiracy

---

[16](...continued)
Third Degree" followed the same format, with similar corresponding variations.

[17]    It is not clear from the record, whether Ines specifically requested Assault 1, 2, and 3 as included offenses of Count 1, Accomplice to Attempted Murder.  The record reflects that the Assault 1, 2, and 3 instructions were argued only with respect to Count 2 (Attempted Murder against Lafoga), and there is no specific mention of these same offense instructions being requested for Count 1 against Ines.  Nevertheless, we review Ines's contention under the plain error standard of review.  See DeLeon, 131 Hawai‘i at 479, 319 P.3d at 398.

> to commit assault is not an included offense.
>
> . . . .
>
> And accordingly, this Court concludes that there are no included offenses for the charge of Conspiracy to Commit Murder in the Second Degree and respectfully denies any request to include included offenses.

(Emphasis added).

The Circuit Court relied on authority from other jurisdictions, People v. Cortez, 234 Cal. Rptr. 3d 609 (Cal. Ct. App. 4 Dist. 2018) and the unpublished disposition of State v. Vasquez, No. 110,735, 2014 WL 5614635 (Kan. Ct. App. Oct. 24, 2014). In Cortez, the defendant argued that the trial court was required to instruct on conspiracy to commit assault with a firearm, and conspiracy to shoot into an inhabited home, as included offenses of conspiracy to commit murder. 234 Cal. Rptr. 3d at 615-16. The court observed that for a conspiracy offense, "[t]he conspiratorial agreement is itself the essence of the crime," and "it is the agreement, not the overt act, which is punishable." Id. at 618 (citation omitted). The Cortez court held:

> [T]he trial court was not required to instruct sua sponte on either of these offenses, because the accusatory pleadings did not place defendant on notice of prosecution of any conspiracy offense, other than conspiracy to commit murder. Although the overt acts allegations describe acts that would support charges for assault and shooting at an inhabited dwelling, such allegations are insufficient to support charges based on those target offenses, because there are no allegations of the requisite element of defendant agreeing or conspiring to commit those target offenses. Therefore, the trial court did not err in not sua sponte instructing on conspiracy to commit assault or shoot at an inhabited dwelling as lesser included offenses of conspiracy to commit murder.

Id. at 620 (emphasis added) (citations omitted).

In Vasquez, the prosecution had charged the defendant (with respect to a complainant named Magdiel Cobieya, in a case involving multiple complainants) with attempted first-degree murder and conspiracy to commit first-degree murder. 2014 WL 5614635, at *1. The trial court instructed the jury on aggravated battery as a lesser included offense of attempted murder, and on conspiracy to commit aggravated battery as a

37

lesser included offense of the conspiracy to commit murder; the jury convicted Vasquez of these lesser offenses. <u>Id.</u> The appellate court reversed, holding that aggravated battery was not an included offense of attempted murder, and that conspiracy to commit aggravated battery was not an included offense of conspiracy to commit murder, as follows:

> [A] conspiracy to commit first-degree murder, as charged here, <u>requires an agreement among the participants to carry out an intentional killing. A conspiracy to commit an aggravated battery is a different crime</u> essentially entailing an agreement to inflict bodily harm, great bodily harm, or a similar injury short of death of the victim. So a <u>conspiracy to commit aggravated battery is not a lesser offense of a conspiracy to commit murder, since those crimes have different agreed-upon objectives and, hence, different elements</u>.

<u>Id.</u> at *2 (emphases added) (citation omitted).

On appeal, Ines does not challenge the Circuit Court's specific ruling that the offenses that Ines requested instructions for, were not included offenses for Conspiracy to Commit Murder. Instead, Ines argues that the evidence showed a rational basis to acquit Ines of Accomplice to Attempted Murder and Conspiracy to Commit Murder and to convict him of one of the lesser offenses he requested instruction for, because the evidence reflected Ines's intent was only to harm, and not necessarily to kill Stout. Ines points to evidence that Ines was heard to say at the outset of the incident, "This person needs a beating;" and that Ines told Stout, "I'm not going to kill you, we're just gonna beat you and let you go." Ines argues that his statement ordering someone to "take care of the body" or "take care of him" was "vague and unclear," and "did not necessarily mean to shoot or kill Stout," and posits that "Lafoga may have chosen to shoot Stout on his own."

We do not reach Ines's contention that there was a rational basis to instruct on Assault 1, 2, and 3 and Conspiracy to Commit Assault 1, 2, and 3, because we conclude that these offenses are not included offenses of Accomplice to Attempted Murder or Conspiracy to Commit Murder under HRS § 701-

109(4)(a).[18]  We also find the cases cited by the Circuit Court persuasive.

An offense is included under HRS § 701-109(4)(a) when it is established by proof of the same or less than all of the facts required to prove the charged offense.  "The general rule is that an offense is included if it is impossible to commit the greater without also committing the lesser."  Manuel, 148 Hawaiʻi at 440, 477 P.3d at 880 (internal quotation marks omitted) (quoting State v. Friedman, 93 Hawaiʻi 63, 72, 996 P.2d 268, 277 (2000) (citation omitted)).  Assault 1, 2, and 3 require proof of bodily injury, with the severity of injury determining the grade of assault.  See HRS §§ 707-710, 707-711, 707-712.  An Accomplice to Attempted Murder offense does not require proof of bodily injury; rather, in this case the State was required to prove the conduct of aiding or agreeing or attempting to aid another person in the planning or commission of the target offense of Attempted

---

[18]     HRS § 701-109(4) (2014) provides that an offense is "included in an offense charged in the . . . indictment" if:

> (a)   It is established by proof of the same or less than all the facts required to establish the commission of the offense charged;
>
> (b)   It consists of an attempt to commit the offense charged or to commit an offense otherwise included therein; or
>
> (c)   It differs from the offense charged only in the respect that a less serious injury or risk of injury to the same person, property, or public interest or a different state of mind indicating lesser degree of culpability suffices to establish its commission.

Subsection (4)(b) does not apply because Assault 1, 2, and 3 do not consist of an attempt to commit Accomplice to Attempted Murder, and Conspiracy to Commit Assault 1, 2, and 3 do not consist of an attempt to commit Conspiracy to Commit Murder.

Subsection (4)(c) also does not apply.  "An offense is a lesser included offense under HRS § 701-109(4)(c) if it either (a) creates a 'less serious risk of injury' to the same person or (b) 'a different state of mind indicating a lesser degree of culpability suffices to establish its commission.'"  Flores, 131 Hawaiʻi at 52, 314 P.3d at 129 (quoting HRS § 701-109(4)(c)).  The offenses must otherwise be similar, with these two differences (i.e. degree of risk of injury and state of mind), as the "only" permissible distinctions between the offenses.  HRS § 701-109(4)(c).  As we explain infra, the greater offenses of Accomplice to Attempted Murder and Conspiracy to Commit Murder are materially different from the lesser offenses of Assault 1, 2 and 3, and Conspiracy to Commit Assault 1, 2, and 3.  The greater offenses of Accomplice to Attempted Murder and Conspiracy to Commit Murder are also not injury-dependent offenses.

Murder.  HRS § 702-222(1)(b);[19] see State v. Brantley, 84 Hawaiʻi 112, 121, 929 P.2d 1362, 1371 (App. 1996) (distinguishing proof of accomplice liability for second degree murder from second degree murder); Vasquez, 2014 WL 5614635, at *2 (holding that aggravated battery not an included offense of attempted murder). Because it is possible, rather than "impossible," to commit the greater offense of Accomplice to Attempted Murder without also committing the lesser offenses of Assault 1, 2, and 3, the assault offenses are not included offenses for Accomplice to Attempted Murder under HRS § 701-109(4)(a).  Manuel, 148 Hawaiʻi at 440, 477 P.3d at 880.

Similarly, we conclude that Conspiracy to Commit Assault 1, 2, and 3 are not included offenses under HRS § 701-109(4)(a) for Conspiracy to Commit Murder.  "Criminal conspiracy" requires the defendant to "agree[] with one or more persons" that they or one of them "will engage in or solicit" either the conduct or the result of the specific offense, and the commission of "an overt act in pursuance of the conspiracy."  HRS § 705-520.[20]  Here, Ines was charged in Count 3 that he and Lafoga

---

[19]    HRS § 702-222(1) (2014), the accomplice liability statute, provides:

A person is an accomplice of another person in the commission of an offense if:

(1)    With the intention of promoting or facilitating the commission of the offense, the person:

(a)    Solicits the other person to commit it;

(b)    Aids or agrees or attempts to aid the other person in planning or committing it; or

(c)    Having a legal duty to prevent the commission of the offense, fails to make reasonable effort so to do . . . .

[20]    HRS § 705-520 (2014), "Criminal conspiracy," provides:

A person is guilty of criminal conspiracy if, with intent to promote or facilitate the commission of a crime:

(1)    He agrees with one or more persons that they or one or more of them will engage in or solicit the conduct or will cause or solicit the result specified by the definition of the offense; and

(continued...)

40

"did agree with each other that they or one or more of them would engage in . . . and/or solicit the result specified" in the offense of "Murder in the Second Degree" and that it "was part of said conspiracy that the Defendants would intentionally or knowingly cause the death of Kele Stout."  Thus, the Conspiracy to Commit Murder required an agreement by Ines and Lafoga "to carry out an intentional killing" of Stout, but a Conspiracy to commit an assault "is a different crime essentially entailing an agreement to inflict" some degree of bodily injury "short of death of the victim."  Vasquez, 2014 WL 5614635, at *2.  Because the offenses are different, it is possible, rather than "impossible," to commit the greater offense of Conspiracy to Commit Murder, without also committing the lesser offenses of Conspiracy to Commit Assault 1, 2, and 3.  Manuel, 148 Hawai'i at 440, 477 P.3d at 880.  Thus, HRS § 701-109(4)(a) does not apply.

For these reasons, the Circuit Court did not err in refusing the instructions, as Assault 1, 2, and 3, and Conspiracy to Commit Assault 1, 2, and 3, were not lesser offenses to the greater offenses of Accomplice to Attempted Murder and Conspiracy to Commit Murder.  See id. at 439, 477 P.3d at 879.

> **E.  The jury instruction that referred to a non-extended sentence for Attempted Murder as a "possible life term of imprisonment" was not erroneous under State v. Keohokapu.**

Both Lafoga and Ines contend that during the extended term trial, the Circuit Court erred in its extended term jury instruction for the Attempted Murder offense, where the jury was instructed that the non-extended sentence for Attempted Murder for Lafoga, and Accomplice to Attempted Murder for Ines, was a "possible life-term of imprisonment."[21]

---

[20](...continued)
> (2)  He or another person with whom he conspired commits an overt act in pursuance of the conspiracy.

[21]  As to Lafoga, the Circuit Court instructed:

> In Counts 2, 4, 6, and 8, the prosection has alleged
> (continued...)

[21] (...continued)
that Defendant Brandon Fetu Lafoga is a persistent offender, a multiple offender, and that extended terms of imprisonment are necessary for the protection of the public. The prosecution has the burden of proving these allegations beyond a reasonable doubt. It is your duty to decide, in each count, whether the prosecution has done so by answering the following three essential questions on special interrogatory forms that will be provided to you:

1. Has the prosecution proved beyond a reasonable doubt that Defendant Brandon Fetu Lafoga is a persistent offender in that he has previously been convicted of two or more felonies committed at different times when he was eighteen years of age or older?

2. Has the prosecution proved beyond a reasonable doubt that Defendant Brandon Fetu Lafoga is a multiple offender in that he is being sentenced for two or more felonies?

3. Has the prosecution proved beyond a reasonable doubt that it is necessary for the protection of the public to extend the sentences for Defendant Brandon Fetu Lafoga in Count 2 _from a possible life term of imprisonment to a definite life term of imprisonment_, in Counts 4 and 6 from a possible twenty-year term of imprisonment to a possible life term of imprisonment, and in Count 8 from a possible ten-year term of imprisonment to a possible twenty-year term of imprisonment?

(Emphasis added).

As to Ines, the Circuit Court instructed:

In Counts 1, 5, and 7, the prosecution has alleged that Defendant Ranier Ines is a persistent offender, and that extended terms of imprisonment are necessary for the protection of the public. The prosecution has the burden of proving these allegations beyond a reasonable doubt. It is your duty to decide, in each count, whether the prosecution has done so by answering the following two essential questions on special interrogatory forms that will be provided to you:

1. Has the prosecution proved beyond a reasonable doubt that Defendant Ranier Ines is a persistent offender in that he has previously been convicted of two or more felonies committed at different times when he was eighteen years of age or older?

2. Has the prosecution proved beyond a reasonable doubt that it is necessary for the protection of the public to extend the sentences for Defendant Ranier Ines in Count 1 _from a possible life term of imprisonment to a definite life term of imprisonment_, and in Counts 5 and 7 from a possible twenty-year term of imprisonment to a possible life term of imprisonment?

(Emphasis added).

(continued...)

Specifically, the defendants challenge the language that asked the jury whether it was "necessary for the protection of the public to extend" the sentence "from a possible life term of imprisonment to a definite life-term of imprisonment." Lafoga argues that the Circuit Court's instruction "characterized the non-extended sentence for attempted murder in the second degree as a 'possible life term of imprisonment' understated the penalty" for the offense, and was "misleading and confusing and prejudiced Lafoga." Ines argues that the instruction was "incorrect and misleading as it gave the jury the impression that without the jury finding 'it was necessary for the protection of the public,' Ines may not be sentenced to life imprisonment." As explained <u>infra</u>, we reject the defendants' contentions in light of <u>State v. Keohokapu</u>, 127 Hawaiʻi 91, 276 P.3d 660 (2012), which is dispositive.

Lafoga objected below to the instruction as follows, joined by Ines:

> [LAFOGA'S COUNSEL]: Judge, we would be objecting to the Court's instruction on page 30 and 31. <u>And our specific objection is</u> that in paragraph 3, line 3, the Court discusses and uses <u>the phrase or the words possible life term of imprisonment</u>. And we would argue at this point in time that <u>a possible life term of imprisonment would lead or could lead one or more of the jurors to think that there was not going to be a life term of imprisonment here</u>. In other words, when you use the word possible, it means it's —— it can be interpreted as being, oh, there may be a life term of imprisonment or there may not be a life term of imprisonment. So we object to the —— to the phrase possible term of imprisonment.
>
> . . . .
>
> <u>I think that's crystal clear that there's going to be a life sentence and that the only question is whether or not there's ever going to be a chance for parole</u>. And that's why I submitted the —— the instructions regarding what parole is also.
>
> So we would argue that long story short is that the phrase possible life term of imprisonment could leave the

---

[21](...continued)
These instructions for both defendants followed Hawaiʻi Pattern Jury Instructions - Criminal (**HAWJIC**) 19.3.1A (Persistent offender under HRS § 706-662(1)) and 19.3.4A (Multiple offender under HRS § 706-662(4)), which identically provide in pertinent part: "2. Has the prosecution proved beyond a reasonable doubt that it is necessary for the protection of the public to extend the Defendant's sentence from a . . . [possible life term of imprisonment] to a . . . [definite life term of imprisonment]?"

> jury to think that there's not going to be a life term of imprisonment.  <u>If the jury is led to believe that there's not going to be a life term of imprisonment, then it's -- it's more likely that they will say that an extended term is necessary for the protection of the public.  And for that reason, we object, Judge</u>.

(Emphases added).  The Circuit Court overruled the objection.[22] Neither the Circuit Court nor the parties mentioned <u>Keohokapu</u> at this point, but in subsequent discussion on whether a defense witness would be allowed to testify regarding parole procedure, the Circuit Court addressed <u>Keohokapu</u>, and ruled that the jury instructions "should not include the mention of parole," citing <u>Keohokapu</u>.[23]

The extended term jury instruction for both defendants was not erroneous under <u>State v. Keohokapu</u>.  In <u>Keohokapu</u>, the Hawaiʻi Supreme Court reviewed the instructions on parole procedures that were given to the jury in that case, and explained that the jury "is responsible only for determining whether the prosecution has proven beyond a reasonable doubt the *facts* necessary for the imposition of an extended term."  127 Hawaiʻi at 111, 276 P.3d at 680 (citations omitted).  The jury "must find that a longer term than the statutory maximum is necessary for the protection of the public."  <u>Id.</u>  The <u>Keohokapu</u> Court held that:  "[t]o determine whether an extended term of imprisonment is necessary for the protection of the public, . . . the jury should not be instructed about the procedures of the

_____

[22]    In overruling the objection, the Circuit Court initially stated:

>     THE COURT:  I understand the concern and the objection, [Lafoga's Counsel].  It sort of dovetails into the Court's previous concern about having the jury making or at least having on their mind that they are in fact fashioning the sentence in this case when they are not.
>
>     . . . .
>
>     <u>So over Defendant Lafoga's objection, the instructions on page 30 and 31 will be given to the jury</u>.

(Emphasis added).

[23]    Despite the Circuit Court's express reliance on <u>Keohokapu</u> as a basis for its ruling overruling the defendants' objection to the "possible life term of imprisonment" language in the instruction, none of the parties addressed <u>Keohokapu</u> in their briefs.

Hawaiʻi Paroling Authority, or that the sentence includes the possibility of parole."  Id.  "Whether the defendant will ever be paroled is pure speculation since parole is dependent on circumstances in the future and is discretionary with the Hawaiʻi Paroling Authority."  Id. at 112, 276 P.3d at 681.  The choice for the jury in Keohokapu involved whether to extend a 20-year sentence for manslaughter to life with the possibility of parole. Id. at 110, 276 P.3d at 679.  The Supreme Court held:

> The jury should instead have been instructed and asked whether it was necessary to extend Petitioner's sentence from a possible twenty year sentence to a possible life sentence for the protection of the public.  Also, an interrogatory phrased in this manner would have been accurate and at the same time would not direct the jury's attention to the potential issues of parole.  This would be the appropriate way for the jury to consider the maximum length of the two potential terms.

Id. at 112, 276 P.3d at 681 (emphases added) (footnote omitted).

The Keohokapu Court also specifically addressed how a jury instruction should be fashioned in a case such as ours, involving a choice between life with or without parole, in footnote 33:

> This case does not involve a choice between life with the possibility of parole and life without the possibility of parole, such as in the case of a motion for extended term for the offense of murder in the second degree pursuant to HRS § 706-661(1).  See n. 6. supra.  The court may impose an extended term of life without parole under HRS § 706-661(1) if the jury finds pursuant to HRS § 706-662 that an extended term is necessary for the protection of the public, as well as one or more of the factors specified under HRS § 706-662. A like instruction in such a case would be to instruct the jury to consider whether the defendant's sentence should be extended from possible life imprisonment to a definite (or fixed) sentence of life imprisonment.

Id. at 112 n.33, 276 P.3d at 681 n.33 (emphases added).

Here, the extended term jury instructions for both defendants had the jury consider whether the defendants' sentences should be extended "from a possible life term of imprisonment to a definite life term of imprisonment," consistent with Keohokapu, and were not inaccurate, or misleading.  See Stanley, 148 Hawaiʻi at 500, 479 P.3d at 118.  To include the parole references of "with" or "without" the "possibility of parole," would run afoul of the Keohokapu Court's admonition that

"the jury should not be instructed" about parole procedures, and their attention should not be directed to "the potential issues of parole."  127 Hawai'i at 111-12, 276 P.3d at 680-81.  We conclude that the Circuit Court's extended term jury instructions for both defendants were not erroneous.  See id.

### F. Extended sentencing under HRS § 706-661(1) applies to attempted second degree murder.

Both Lafoga and Ines contend that the extended sentencing statute, HRS § 706-661(1), only applies to second degree murder and not to *attempted* second degree murder.  The issue here is whether the "murder in the second degree" reference in the extended sentencing statute HRS § 706-661(1),[24] includes attempted murder in the second degree.  We conclude that it does.

At Lafoga's sentencing, the Circuit Court granted the State's request for an extended term for Lafoga on Count 2, Attempted Murder, under HRS § 706-661(1), sentencing Lafoga to life without parole,[25] reasoning as follows:

> THE COURT:  In Count No. 2, the Court also adopts the finding of the jury in the previous conclusions and does find, despite the language of the statute, that the extended

---

[24]    HRS § 706-661 (2014) provides:

**Extended terms of imprisonment.**  The court may sentence a person who satisfies the criteria for any of the categories set forth in section 706-662 to an extended term of imprisonment, which shall have a maximum length as follows:

(1)  For murder in the second degree--life without the possibility of parole;

(2)  For a class A felony--indeterminate life term of imprisonment;

(3)  For a class B felony--indeterminate twenty-year term of imprisonment; and

(4)  For a class C felony--indeterminate ten-year term of imprisonment.

When ordering an extended term sentence, the court shall impose the maximum length of imprisonment. The minimum length of imprisonment for an extended term sentence under paragraphs (2), (3), and (4) shall be determined by the Hawaii paroling authority in accordance with section 706-669.

[25]    Lafoga's counsel objected without argument to the imposition of extended terms.  The argument made on appeal was not raised below.

term is applicable. And even though 706-661 only specifies Murder in the Second Degree, the Court is mindful, as pointed out by [the Prosecutor], that limitation that excludes other A felonies such as Attempted Murder in the Second Degree as in this case, as well as Accomplice to Commit Murder in the Second Degree that's applicable to the co-defendant in this case. It would be an absurdity to have those serious offenses not be subject to extended terms, so the Court cannot conclude that the omission was purposeful by the legislature when the premise of extended terms are for the protection of the public.

And the Court is mindful of interpretation rules pursuant to *State versus Tsujimura*, T-S-U-J-I-M-U-R-A, 140 Haw. 229 (sic), 2017, wherein the Court is obliged to construe statutes such that they do not lead and result in absurdity. This conclusion is also in pari materia with the Hawaii statutory scheme that treats murder and attempted murder, unless it manifests exception of depravity,[26] to be the same severity for sentencing purposes. And this is HRS Section 706-656 and pursuant to *State versus Hussein*, H-U-S-S-E-I-N, 122 Haw. 495, 2010, where the supreme court has indicated that statutes that relate to sentencing should be construed in pari materia.

(Footnote added). At Ines's sentencing, the Circuit Court reiterated the same reasoning based on statutory construction principles, and sentenced Ines to an extended term of life without parole in Count 1, Accomplice to Attempted Murder.[27]

In support of his argument, Lafoga points to other sentencing statutes that distinctly refer to second degree murder

---

[26]    The Circuit Court was referring to HRS § 706-657 (2014), "Enhanced sentence for second degree murder," for a murder that is "especially heinous, atrocious, or cruel, manifesting exceptional depravity . . . ." This statute, like HRS § 706-661, does not expressly enumerate "attempted" second degree murder, and provides as follows:

> The court may sentence a person who was eighteen years of age or over at the time of the offense and who has been convicted of murder in the second degree to life imprisonment without the possibility of parole under section 706-656 if the court finds that the murder was especially heinous, atrocious, or cruel, manifesting exceptional depravity or that the person was previously convicted of the offense of murder in the first degree or murder in the second degree in this State or was previously convicted in another jurisdiction of an offense that would constitute murder in the first degree or murder in the second degree in this State.

(Emphasis added).

[27]    Ines's counsel did not object to the extended sentence, and on appeal, Ines challenges the sentence as illegally imposed. HRPP Rule 35(a) provides that the court "may correct an illegal sentence at any time . . . ." See also Flubacher v. State, 142 Hawaiʻi 109, 114 n.7, 414 P.3d 161, 166 n.7 (2018) (noting that pursuant to HRPP Rule 35, the court may correct an illegal sentence at any time).

and attempted second degree murder as separately enumerated offenses, such as HRS §§ 706-606.5(2), 706-656(2), and 706-660.1.[28]  According to Lafoga, these statutes all consistently show that "'murder in the second degree' is not an umbrella term that encompasses both murder in the second degree and attempted murder in the second degree."  Lafoga argues that based on the plain meaning of HRS § 706-661(1), Lafoga was not subject to an extended sentence of life without parole for Attempted Murder.  Ines similarly claims his sentence for Accomplice to Attempted Murder "was illegal" because the "plain and unambiguous" language of HRS § 706-661(1) "does not provide for an extended term of imprisonment for attempted murder in the second degree."

As the defendants point out, the extended sentencing statute, HRS § 706-661, does not specifically include the offense of *attempted* second degree murder in subsection (1).  We do not agree with the defendants, however, that the absence of the word "attempted" necessarily means that the attempted second degree murder offense is excluded.  The State urges this court to read HRS §§ 705-502 and 706-661 together, to conclude that attempted second degree murder "clearly does not fall under any of the other classes of felonies," and thus, the offense should be included in subsection (1).  We find this argument persuasive.

---

[28]     HRS § 706-606.5, "Sentencing of Repeat Offenders, "repeatedly references "murder in the second degree or <u>attempted murder in the second degree</u>" throughout the statute.  (Emphasis added).  HRS § 706-656(2), "Terms of Imprisonment for First and Second Degree Murder and Attempted First and Second Degree Murder," provides:  "persons convicted of second degree murder and <u>attempted second degree murder</u> shall be sentenced to life imprisonment with possibility of parole."  (Emphasis added).  HRS § 706-660.1, "Sentence of Imprisonment for Use of a Firearm, Semiautomatic Firearm, or Automatic Firearm in a Felony," repeatedly references "murder in the second degree and <u>attempted murder in the second degree</u>" throughout the statute.  (Emphasis added).

Additional sentencing statutes contain the same separate enumeration.  <u>See</u> HRS § 706-610(1) ("Class of Felonies") ("Apart from first and second degree murder and attempted first and second degree murder, felonies defined by this Code are classified, for the purposes of sentence, into three classes . . . ."); HRS § 706-620(1) ("Authority to Withhold Sentence of Imprisonment") (stating "first or second degree murder or attempted first or second degree murder"); HRS § 706-640(1)(a) ("Authorized Fines") (providing for a $50,000 fine "when the conviction is of a class A felony, murder in the first or second degree, or attempted murder in the first or second degree"); and HRS § 706-667(4) ("Young Adult Defendants") (stating that "[T]his section shall not apply to the offenses of murder or attempted murder.").  <u>But see</u> HRS § 706-657 (enhanced sentence for second degree murder of "exceptional depravity"), quoted <u>supra</u>.

"Laws in pari materia, or upon the same subject matter, shall be construed with reference to each other.  What is clear in one statute may be called in aid to explain what is doubtful in another."  HRS § 1-16 (2009); see State v. Glenn, 148 Hawai'i 112, 127, 468 P.3d 126, 141 (2020) (quoting State v. Kamana'o, 118 Hawai'i 210, 218, 188 P.3d 724, 732 (2008) ("It is a canon of construction that statutes that are in pari materia may be construed together, so that inconsistencies in one statute may be resolved by looking at another statute on the same subject.")).

The statutes in the Hawai'i Penal Code (**the Code**) that address the classification of attempt offenses, classes of felonies, classification and grading of second degree murder, and defining the second degree murder offense, i.e. HRS §§ 701-107, 705-502, 706-610, and 707-701.5 -- all serve as an "aid to explain" whether the "murder in the second degree" reference in the HRS § 706-661(1) extended sentencing statute includes *attempted* murder in the second degree.  See HRS § 1-16.

HRS § 701-107 (2014), "Grades and classes of offenses," provides that offenses defined under the Code are of three grades:  felonies, misdemeanors, and petty misdemeanors.  "Felonies include murder in the first and second degrees, attempted murder in the first and second degrees, and the following three classes:  class A, class B, and class C."  Id. (emphasis added).  Thus, HRS § 701-107 establishes that attempted second degree murder is a felony that is separate and distinguishable from Class A, B, and C felonies.

HRS § 705-502 (2014), "Grading of criminal attempt," provides:  "An attempt to commit a crime is an offense of the same class and grade as the most serious offense which is attempted."  Thus, HRS § 705-502 establishes that attempted second degree murder and second degree murder are treated as the same grade of offense.[29]

---

[29]     In his Reply Brief, Lafoga argues that pursuant to the Commentary to HRS § 705-502, "[a]ttempted murder is treated as an ordinary class A felony," the "extended sentence for an ordinary class A felony is an
(continued...)

HRS § 706-610(1) (2014), "Classes of felonies," provides that:  "<u>Apart from</u> first and second degree murder and <u>attempted</u> first and <u>second degree murder</u>, felonies defined by this Code are classified, for the purpose of sentence, into three classes," Class A, B, and C felonies.  (Emphases added).  Thus, with the exception of attempted first and second degree murder, and first and second degree murder, HRS § 706-610(1) reaffirms that all other felonies fall into one of three classes -- Class A, B, or C.

HRS § 707-701.5 (2014), "Murder in the second degree," provides that second degree murder "is a felony for which defendant shall be sentenced to imprisonment as provided in section 706-656."  The ordinary, un-enhanced sentence for second degree murder and attempted second degree murder is life with parole, under HRS § 706-656(2).[30]  The identical sentence for

---

[29](...continued)
indeterminate life term of imprisonment."  The pertinent portion of the HRS § 705-502 Commentary upon which Lafoga relies, states:

> [T]here is generally no difference in the sanctions which ought to be available to the court when a crime is attempted but not consummated.  <u>However, where the offense attempted is murder, the unique sentence authorized for that crime is not imposed.  Instead, the attempt is treated as any other class A felony</u>.  Because § 706-606 requires mandatory imprisonment, possibly for life, there is room to economize on sentencing for attempted murder.  The various modes of disposition available for a class A felony ought to suffice for correctional needs.

(Emphasis added).

We reject Lafoga's argument for two reasons.  First, HRS § 705-502 has not been amended since 1972, nor has its commentary been updated.  The Commentary refers to an old murder statute, HRS § 706-606, which was substantially amended in 1986, removing the section entitled "Sentence for offense of murder," and replacing it with "Factors to be considered in imposing a sentence."  <u>See</u> 1986 Haw. Sess. Laws Act 314, § 15 at 599-600.  Second, the Commentary is also inaccurate because it says attempted murder is "treated as any other class A felony," when this is no longer true.  HRS § 706-656 clearly provides that for both first and second degree murder, the attempts carry the same penalty as the substantive offense.  Subsection (1) of HRS § 706-656 provides that adults "convicted of first degree murder or first degree attempted murder shall be sentenced to life imprisonment without the possibility of parole."  Subsection (2) provides that "persons convicted of second degree murder and attempted second degree murder shall be sentenced to life imprisonment with possibility of parole."  Therefore, Lafoga's reliance on obsolete language in the Commentary to HRS § 705-502 is misplaced.

[30]    HRS § 706-656 (2014), "Terms of imprisonment for first and second degree murder and attempted first and second degree murder,"
(continued...)

both the substantive offense and the attempt offense is consistent with HRS § 705-502, where attempts are treated as the same grade of offense as the substantive offense.  Considering HRS §§ 705-502 (grading of attempt), 706-656(2) (ordinary sentence for attempted second degree murder), and 706-661(1) in *pari materia*, we conclude that the extended sentence under HRS § 706-661(1) applies for both second degree murder and attempted second degree murder.  See HRS § 1-16.

Our consideration of HRS §§ 701-107 (specifying attempted second degree murder as a felony that is not Class A, B, or C) and 706-610 (excluding attempted second degree murder from Class A, B, or C felonies) in *pari materia* to HRS § 706-661, reinforces our conclusion that the subsection (1) category of "murder in the second degree -- life without the possibility of parole" includes **attempted** second degree murder.  Because attempted second degree murder is a felony that is not a Class A, B, or C felony under HRS § 701-107, the HRS § 706-661 subsections (2), (3), and (4) categories pertaining to Class A, B, and C felonies clearly do not apply.  Therefore, the attempted second degree murder offense is logically categorized in subsection (1) of HRS § 706-661, with the substantive offense of second degree murder.

A "rational, sensible and practicable interpretation of a statute is preferred to one which is unreasonable or impracticable, because the legislature is presumed not to intend an absurd result, and legislation will be construed to avoid, if possible, inconsistency, contradiction, and illogicality."  In re Doe, 90 Hawaiʻi 246, 251, 978 P.2d 684, 689 (1999) (internal citations, brackets and quotation marks omitted).  The Circuit Court reasoned that it would be an "absurdity" to exclude the "serious offenses" of attempted second degree murder for Lafoga

---

[30](...continued)
specifies the sentence for second degree murder in subsection (2):  "Except as provided in section 706-657, pertaining to enhanced sentence for second degree murder, persons convicted of second degree murder and attempted second degree murder shall be sentenced to life imprisonment with possibility of parole. . . ."  (Emphasis added).

and accomplice to attempted second degree murder for Ines from extended term sentencing -- reasoning that the omission of attempted second degree murder from HRS § 706-661(1) could not have been purposeful "when the premise of extended terms are for the protection of the public." We agree. It would be inconsistent for HRS § 706-661 to exclude only the felony of attempted second degree murder from extended sentencing, where lower classes of A, B, and C felonies, including attempts, are all subject to extended sentencing. See id. Similarly, it would be illogical for attempted second degree murder to qualify as a predicate felony to meet the HRS § 706-662[31] "persistent

---

[31] HRS § 706-661 refers to HRS § 706-662 (2014), which sets forth the "Criteria for extended terms of imprisonment," as follows:

A defendant who has been convicted of a felony may be subject to an extended term of imprisonment under section 706-661 if it is proven beyond a reasonable doubt that an extended term of imprisonment is necessary for the protection of the public and that the convicted defendant satisfies one or more of the following criteria:

(1) The defendant is a persistent offender in that the defendant has previously been convicted of two or more felonies committed at different times when the defendant was eighteen years of age or older;

(2) The defendant is a professional criminal in that:

[(setting forth criteria)] . . . ;

(3) The defendant is a dangerous person . . . ;

[(setting forth criteria)] . . . ;

(4) The defendant is a multiple offender in that:

(a) The defendant is being sentenced for two or more felonies or is already under sentence of imprisonment for any felony; or

(b) The maximum terms of imprisonment authorized for each of the defendant's crimes, if made to run consecutively, would equal or exceed in length the maximum of the extended term imposed or would equal or exceed forty years if the extended term imposed is for a class A felony;

(5) The defendant is an offender against the elderly, handicapped, or a minor eight years of

(continued...)

offender" or "multiple offender" criteria for extended sentencing, yet not qualify for extended terms sentencing under HRS § 706-661(1) as a substantive offense.  See id.  Finally, as the Circuit Court observed, because the whole premise of extended sentencing is that an extended term of imprisonment beyond the ordinary maximum sentence "is necessary for the protection of the public," it would be unreasonable for attempted second degree murder, one of the most serious offenses under the Code punishable by a life sentence, to be excluded.  HRS § 706-662; see HRS § 706-661; Doe, 90 Hawai'i at 251, 978 P.2d at 689.

Lafoga was sentenced under HRS § 706-662 (1) and (4)(a) as both a persistent and multiple offender based on his prior felony convictions and the instant attempted second degree murder conviction, and the jury's finding that an extended term was necessary for the protection of the public.  Lafoga's other convictions for Count 4 (Use of Firearm in Separate Felony), and Count 8 (Felon in Possession) were also extended based on the jury's findings.  It would not make sense for the less serious offenses in Counts 4 and 8 to be extended, and not Lafoga's sentence for attempted second degree murder in Count 2.  See Doe, 90 Hawai'i at 251, 978 P.2d at 689.

Likewise, Ines was sentenced under HRS § 706-662(1) as a persistent offender based on his prior convictions and the jury's finding that an extended term was necessary for the protection of the public.  It would not make sense to read HRS § 706-661(1) to preclude extended sentencing for Ines, for the accomplice to attempted second degree murder offense.  See id.

---

[31](...continued)

age or younger in that:

[(setting forth criteria)]

(6)  The defendant is a hate crime offender in that:

[(setting forth criteria)]

. . . .

(Emphases added).

We conclude that the Circuit Court did not err in sentencing both defendants to extended terms under HRS § 706-661(1) for their convictions for attempted second degree murder for Lafoga, and accomplice to attempted second degree murder for Ines.

## IV.  CONCLUSION

For the foregoing reasons, we affirm Lafoga's February 20, 2020 Judgment of Conviction and Sentence, Notice of Entry; and Ines's September 2, 2020 Amended Judgment of Conviction and Sentence, Notice of Entry; both filed by the Circuit Court of the First Circuit.

On the briefs:

William K. Li
for Defendant-Appellant
Brandon Fetu Lafoga

Kai Lawrence
for Defendant-Appellant
Ranier Ines

Stephen K. Tsushima
Deputy Prosecuting Attorney
for Plaintiff-Appellee

/s/ Lisa M. Ginoza
Chief Judge

/s/ Katherine G. Leonard
Associate Judge

/s/ Karen T. Nakasone
Associate Judge